648 So.2d 472 (1994)
STATE of Louisiana
v.
Edward J. JONES.
No. 94-KA-0926.
Court of Appeal of Louisiana, Fourth Circuit.
December 28, 1994.
*473 Harry F. Connick, Dist. Atty., Susan M. Erlanger, Asst. Dist. Atty., New Orleans, for plaintiff/appellee.
*474 Sherry Watters, Orleans Indigent Defender Program, New Orleans, for defendant/appellant.
ARMSTRONG, Judge.
Defendant Edward J. Jones was charged by grand jury indictment with the first degree murder of Keith Nesbitt. He was arraigned and pled not guilty. He later changed his plea to not guilty and not guilty by reason of insanity. At the beginning of trial, the defendant changed his plea to not guilty. A twelve member jury found him guilty as charged. During the sentencing phase, the jury deadlocked. The defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. He now appeals.
ERRORS PATENT:
The record does not contain a minute entry of trial, nor does the docket master reveal when trial occurred. However, the transcript establishes that trial did in fact occur. The trial court issued a per curiam indicating that the defendant was present at all necessary stages of the judicial process. There are no errors patent.
FACTS:
The victim was visiting New Orleans from North Carolina with his cousin, Clarence Nesbit, and their respective wives, Anna and Nadine. When they arrived at their hotel, the Quality Inn on St. Charles Avenue, the women went inside to register. Clarence Nesbit later went into the hotel to see if the women needed assistance. The victim stayed with the car which he had parked in the neighboring Wendy's restaurant parking lot. Clarence Nesbit exited the hotel and heard his car horn blowing. He opened the driver's side door of the car where the victim was sitting. He saw a black man sitting in the passenger seat, leaning over the console. He had his hand on the victim's shoulder, and he was holding a screwdriver to the victim's head. Clarence Nesbit demanded to know what the man was doing, and the man told him to give him the keys. The victim was already unconscious. Clarence Nesbitt yelled for the police. The man ran, and Clarence Nesbit went into the Wendy's for assistance. He got a good look at the black male, whom he described as wearing a red and white knit cap and a jacket. He could see more of the inside of the jacket because the man was leaning forward, but he thought the jacket was brown. After going to the Wendy's, he went back into the motel to tell the women. When they came back out, a nurse and doctor were attending the victim. Eventually, an ambulance arrived and transported the victim to Charity Hospital. The police arrived and transported Clarence Nesbit to the police station. He gave a description. The police had him view a suspect, but he could not positively identify him as the perpetrator. Then the police showed him a cap and a jacket. He identified the cap. In a few days, the police called him and asked him to view a photographic line-up, and he identified a picture of the defendant. He later identified him at trial.
Dr. Paul McGarry testified that the victim suffered five wounds. The fatal wound was to the left eyebrow and extended into the brain. Each of the wounds had a sharp square cornered edge in the shape of a tip of a screwdriver. The wounds were consistent with a struggle having occurred.
Keisha James, a Wendy's employee, said at 4:30 p.m. she was working at the drive-up window on the side of the restaurant where the crime occurred. She saw two men struggling in the car. One emerged, and the other fell to the window. She then saw Clarence Nesbit come out of the hotel and call for help. She said that the man that ran from the car was wearing a red and white cap and a brown plaid jacket. He was carrying something in his clenched fist. She described the man to the police as a black man with a dark complexion, unshaven, 5'6" and slim. Later that night, the police brought a suspect to the restaurant, but she said that he was not the perpetrator. At the police station, she identified the jacket and cap as the clothing the perpetrator was wearing. A day or so later, she chose the defendant's picture in a photographic line-up.
Carol Dillon, supervisor at Wendy's, saw the two men struggling in the car. She saw Clarence Nesbit walk up to the car and heard him call for the police. She saw the *475 perpetrator exit the car and run towards Erato Street. She viewed the man the police took to the police station as a suspect, but she said that the man was not the perpetrator. She identified the recovered clothing as that worn by the perpetrator. She chose a picture of the defendant in a photographic lineup.
Detective Anthony Small said a white, red and black plaid jacket and a red and white cap were discovered in an alleyway next to an abandoned house at 1414 Carondelet Street. The jacket had blood spots on the sleeve. Small returned to the police station after viewing the scene. There, he received a phone call from the defendant's sister, Julia Robinson. As a result of the phone call, homicide detectives went to the defendant's house where they picked up his brother, Donnell Bingham, who said that he wanted to give a statement. At the same time, a police unit was searching the area near the crime. Officer William Ceravolo picked up another of the defendant's brothers, Joseph Bingham, because he matched the description. He was transported to the scene, but the witnesses did not identify him. He was taken to the police station, but witnesses still did not identify him. He was released. Julia Robinson and Donnell Bingham came to the police station, and both gave statements. As a result, a warrant was issued for the defendant's arrest.
Officer James Stewart testified that Small told him to go to 1622 Baronne Street to collect some evidence. There, he found a white towel with blood on it, a pair of jeans with blood on them, and a philips head screwdriver.
William Gallien, front desk clerk of the Quality Inn, testified that he had already gotten off of work at the time the crime occurred. He saw a newscast of the arrest of the defendant several days later and recognized him as a man he had seen in the parking lot of the Wendy's when he was leaving work at 3:45 p.m. on the afternoon of the crime. He was shown the photographic line-up and narrowed the possible perpetrators to two, but could not positively identify the defendant in the line-up.
Joseph Bingham testified the defendant lived with their mother at 1622 Baronne Street. He said he did not know whether the hat and jacket belonged to the defendant because he was drunk at the time he was questioned.
The State re-called Det. Small who testified that Joseph Bingham told him the defendant had been wearing, at some earlier time, a cap and jacket like the ones discovered. He told him he could not positively say that the defendant had been wearing the items that day.
Criminologist William Givlin testified that hair found in the recovered cap was similar to the defendant's hair.
Detective Ross Mocklin testified that he heard Joseph Bingham say that the jacket and hat that were recovered belonged to the defendant.
Officer Kevin Imbraguglio said that he arrested the defendant as he was walking down Carondelet Street.
The defendant raises two assignments of error on appeal.
ASSIGNMENT OF ERROR NO. 1:
The defendant argues the trial court erred in failing to give a limiting instruction to the jury as to the use of impeachment testimony. During Joseph Bingham's testimony, he stated he could not remember seeing the cap when he accompanied police to 1414 Carondelet Street because he was inebriated at the time. He could not remember telling the police anything about the jacket or the cap. He said he could not remember seeing the defendant wearing the jacket or cap. He said he might have seen the cap at his mother's house because she owned a lot of caps similar to it. The defense attorney asked that the trial court give a limiting instruction in the event the State tried to impeach Bingham's testimony. The trial court ruled that it would not instruct the jury at the time the testimony was elicited, but that it would instruct the jury at the close of the case. As set out above, the State re-called Det. Small who testified Bingham told him that the defendant had been wearing the jacket and hat that day. Mocklin testified that he heard Bingham say that the jacket and cap belonged *476 to the defendant. Imbraguglio testified, and then the trial court gave the jury a charge on the proper use of impeachment evidence.
La.C.E. art. 613 provides:
Except as the interests of justice otherwise require, extrinsic evidence of bias, interest, or corruption, prior inconsistent statements, conviction of crime, or defects of capacity is admissible after the proponent has first fairly directed the witness' attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so.
When a witness states that he does not recall making a prior inconsistent statement, he does not "distinctly" admit making the statement, and thus the evidence that he did make the statement is admissible. State v. Hicks, 554 So.2d 1298 (La.App. 1st Cir. 1989), writs denied 559 So.2d 1374 (La.1990) and 604 So.2d 1297 (La.1992); State v. Singleton, 454 So.2d 353 (La.App. 4th Cir.1984). Here, the witness stated he did not remember stating that the defendant had been wearing the jacket and cap on the day of the crime. Therefore, he did not "distinctly" admit making the statement, and evidence of the prior inconsistent statement was admissible.
La.C.E. art. 607 provides in pertinent part:
A. Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
* * * * * *
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
Thus, although C.E. art. 613 provides that evidence of a prior inconsistent statement is admissible after the witness fails to "distinctly" admit the statement, C.E. art. 607 limits the purpose of the admission; it may only be admitted to attack the credibility of a witness and then only when its probative value is not outweighed by confusion of time, confusion of the issues, or unfair prejudice. In this case, the evidence elicited from Bingham, Det. Small and Det. Mocklin appears to have been offered for the proper purposeto show that Bingham was not credible when he said he did not remember identifying the clothing as having been worn by the defendant. The evidence was brief, and the issue simple. There was no unfair prejudice to the defendant. Thus, the evidence was properly admitted.
The defendant argues, however, that the trial court refused to give a limiting instruction explaining that the evidence was only admissible for impeachment purposes. La.C.E. art. 105 provides:
When evidence which is admissible as to one party or for one purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly. Failure to restrict the evidence and restrict the jury shall not constitute error absent a request to do so. (Emphasis added).
In the instant case, the defense did request a limiting instruction, and the mandatory nature of C.E. art. 105 establishes that the defense was so entitled. The record establishes that the instruction was in fact given. However, the trial court did not immediately give the instruction after the testimony was admitted. The trial court should instruct the jury at the time the evidence is admitted. State v. Taylor, 593 So.2d 431 (La.App. 2nd Cir.1992), citing State v. Kaufman, 304 So.2d 300 (La.1974). Here, the trial court chose to wait until the end of trial to give the limiting instruction. However, as set out above, the evidence elicited from the three witnesses about which the defendant complains was elicited just before the trial concluded. Since *477 the instruction was given so close in time to the introduction of the testimony, we find that the trial court did not err in giving the instruction when it did. Moreover, a harmless error analysis is applicable to erroneous admission of prior inconsistent statements. Taylor. Here, in light of the fact that three witnesses made positive identifications of the defendant, the fact that the limiting instruction was given later than it should have been could not have contributed to the verdict, and any error was therefore harmless.
We find no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 2:
When Det. Small was re-called to the stand, the prosecutor began asking him questions concerning the events surrounding the defendant's arrest. Det. Small testified that he saw the defendant at the Homicide Office after Imbroguglio had arrested him. He said that he advised the defendant of his rights. He said Crime Lab Technician Deborah Prosper took a hair sample and a sample of the defendant's nail scrapings. The prosecutor then asked him what happened next, and Det. Small answered, "Well, he refused to give a statement." The defense asked that the jury be removed, and the jury was removed. The defense then moved for a mistrial on the basis that the officer's comment on the defendant's silence was in violation of his constitutional right to remain silent. The trial court denied the motion. The defense then asked for an admonition, but the trial court refused to give one.
La.C.Cr.P. art. 770(3)[1] provides that if the judge, district attorney or a court official, either directly or indirectly, makes an impermissible reference to the failure of the defendant to testify, a motion for mistrial must be granted, if requested by the defense. However, in the instant case, the reference was made by a police officer. A police officer is not a "court official" under La.C.Cr.P. Article 770. State v. Lee, 618 So.2d 551 (La.App. 4th Cir.1993), writ denied, 624 So.2d 1222 (La.1993); State v. Tatum, 506 So.2d 584 (La.App. 4th Cir.1987). Absent a showing of a pattern of unresponsive answers or improper intent by the prosecutor, a mistrial is not warranted. Lee, supra.
In the instant case, the prosecutor simply asked what happened after the hair sample and nail scraping were taken. It does not appear that the prosecutor intended to elicit testimony concerning the defendant's refusal to give a statement. Moreover, even if the responses of the officer or the intent of the prosecutor were called into question in this case, a mandatory mistrial under Article 770 would not be appropriate. In State v. Smith, 336 So.2d 867 (La.1976), the Louisiana Supreme Court pointed out that Article 770 does not apply to references to a defendant's post-arrest silence by the prosecutor or by witnesses, but only applies to references to the defendant's failure to testify at trial. Rather, La.C.Cr.P. art. 771[2] is the applicable *478 provision concerning the proper remedy where references are made to a defendant's post-arrest silence.
Under La.C.Cr.P. art. 771, the trial court has the discretion to grant a mistrial or simply admonish the jury, upon the request of the defendant, where the prosecutor or a witness makes a reference to a defendant's post-arrest silence. In Smith, the decision did not reflect that an admonition was given to the jury. Finding that the reference by the attorney was "incidental" and inadvertent" and there was no "indication of the deliberate intent of the State to inject or exploit the issue," the appellate court held that the trial court did not abuse its discretion in denying the motion for mistrial. The motion for mistrial had been based upon a comment made by the prosecuting attorney during the direct examination of the arresting officer in an attempt to summarize the officer's testimony. The prosecutor stated that the defendant had "refused to give a statement" when he was under custodial arrest.
In State v. Montoya, 340 So.2d 557 (La. 1976), the defendant committed armed robbery of a pharmacy. During direct examination of the arresting officer, the State asked the officer if the officer had asked the defendant after he was arrested where he had gotten the drugs. The officer responded that he had asked the defendant, but the defendant did not answer. The defense objected to the question, but did not move for a mistrial. The record did not indicate that the judge admonished the jury.
On appeal, the Montoya court found that the reference made to defendant's silence during custodial arrest was reversible error in that it violated the defendant's constitutional rights to remain silent under Miranda. The court relied primarily upon Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) where the United States Supreme Court ruled that the State could not use a defendant's silence during custodial arrest to impeach defendant's exculpatory testimony at trial. The Montoya court relied on the following part of the Doyle decision:
The warnings mandated by [Miranda], as a prophylactic means of safeguarding Fifth Amendment rights, see Michigan v. Tucker, 417 U.S. 433, 443-444, 94 S.Ct. 2357, 2363-2364, 41 L.Ed.2d 182 (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See United States v. Hale, 422 U.S. [171], at 177, 95 S.Ct. [2133] at 2137 [45 L.Ed.2d 99 (1975)]. Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who received the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. Mr. Justice White, concurring in the judgment in United States v. Hale, 422 U.S. at 182-183, 95 S.Ct. at 2139 [45 L.Ed.2d 99] put it very well: `... when a person under arrest is informed, as Miranda requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony ... Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from Miranda warnings that this would not be the case.'
426 U.S. at 617, 96 S.Ct. at 2245, 49 L.Ed.2d at 97-98. (Footnotes omitted.)
*479 Unlike in Doyle, the defendant in Montoya did not take the stand, so that the State's reference to defendant's custodial arrest silence in Montoya was not used to impeach the defendant's testimony. However, the Montoya court found that the reasoning in Doyle should apply with even stronger force when a defendant does not take the stand. The Montoya court stated:
In the instant case the defendant did not take the stand. Thus, there is even less justification here for the State to call attention to his silence at the time of arrest than there was in Doyle, because the argument cannot be made that he was under cross-examination and thus fair game for impeachment by use of his silence at the time of his arrest. Therefore, we conclude it was clearly reversible error for the trial court to permit the State to use the arrested person's silence against him at trial. Doyle v. Ohio, supra; cf. United States v. Hale, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). Id. at 560.
Montoya did not discuss C.Cr.P. arts. 770 and 771. Nor did it discuss the Smith decision, discussed supra which appears to be contradictory to it. Taken by itself, Montoya appears to hold that reference to a defendant's custodial arrest silence is unqualifiedly unconstitutional and mandates a mistrial for that reason. However, later decisions indicate that whether reference to a defendant's silence during custodial arrest warrants reversal depends upon the facts of the case and may under some situations constitute harmless error.
In State v. Hicks, 483 So.2d 1200 (La.App. 4th Cir.1986), writ denied, 488 So.2d 197 (La.1986), the defendant was convicted of second degree murder. On appeal, he contended that the trial court erred in denying his motion for a mistrial because the State, during direct examination of the investigating officer, elicited from the officer that the officer had read the defendant his Miranda rights after which the defendant told him he did not want to make a statement, but instead wanted to consult with his attorney. The record does not reflect that the judge admonished the jury. The defense contended that the statement was an improper comment on his right to remain silent and constituted reversible error under Doyle. This Court held that the trial court did not err in denying the motion for mistrial. This court found that while the complained of reference constituted error, the error was not reversible error because the evidence of defendant's guilt was overwhelming and because the "only real issue in the trial, that of defendant's sanity, was not affected by this improper question." Id. at 1202.
In State v. Carmouche, 499 So.2d 1227 (La.App. 4th Cir.1986), during the direct examination of the arresting officer by the State the prosecutor bluntly asked whether the defendant made a statement after having been advised of his rights, and the officer said that he had not. On appeal, the defense contended that the trial court erred in failing to grant a mistrial based upon the reference made to defendant's failure to make any statements to the officer during his custodial arrest. The court did not rule on the issue because the defense had failed to move for a mistrial or admonition at trial. The court noted the following, however:
While we do not decide the issue in his case we note that the circumstances of this case do not necessarily support the same result as in Montoya even if there had been timely objection at trial. First, as in State v. Mosley, 390 So.2d 1302 (La.1980), the examination did not stress or emphasize defendant's right to remain silent; and, second, there is some question that this short colloquy at the very beginning of the trial left such an impression on the jurors that it had any effect on their deliberations. If the issue were properly before us these considerations might support the conclusion that the questioning constituted harmless error at worst as in State v. Procell [365 So.2d 484 (La.1978)], supra.

In State v. Kersey, 406 So.2d 555 (La. 1981), the prosecutor questioned one of the arresting officers about the defendant's statement and his subsequent assertion of the right to remain silent. The court there found the reference to the defendant's postarrest silence did not appear to be for the purpose of simply calling the jury's attention to it or having the jury make an inappropriate *480 inference. The court further found that the reference was an attempt to show that the entire statement made to the officers had been given to the jury and how the interrogation was concluded, rather than to call attention to the silence. The conviction was upheld.
Similarly, in State v. Procell, 365 So.2d 484 (La.1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046 (1979), the court stated:
Article 771 of the Code of Criminal Procedure requires only that the trial judge admonish the jury to disregard the quoted remarks and comments. However, no request that the trial judge admonish the jury was made. Granting a mistrial in this situation was therefore discretionary with the trial judge "if [he] ... is satisfied that an admonition is not sufficient to assure the defendant a fair trial." La.Code Crim. Pro. art. 771; State v. Smith, 336 So.2d 867 (La.1976).
In State v. Carroll, 546 So.2d 1365, 1367 (La.App. 4th Cir.1989), the State, after ascertaining from the testifying officer that the defendant was read his Miranda rights after arrest and understood them, then asked the officer if the defendant, after being read his rights, made any statements to the officer. The officer responded "No." The State did not pursue this response, but began to ask the officer another unrelated question regarding in what parish the events leading up to defendant's arrest occurred. The defense interrupted this question to object to the prior question by the State regarding whether the defendant had made any statements to the officer after the officer read him his Miranda rights. The judge sustained the objection. The defense then moved for a mistrial, which the court denied. Consequently, the defense asked the court to admonish the jury to disregard the response given by the officer, that the defendant had remained silent after being read his Miranda rights. The trial judge did admonish the jury. This court stated:
[W]e conclude that the facts in this case do not warrant reversal. The State, after eliciting from the witness that the defendant did not make any statements upon arrest, moved on to another topic. It did not do anything further to emphasize defendant's silence or to try to get the jury to make a negative inference therefrom during the remainder of the trial. The judge also admonished the jury to disregard the comment about defendant's silence. The evidence of defendant's guilt is considerable. For these reasons, the trial court was within its discretion under C.Cr.P. art. 771 to give an admonishment to the jury instead of declaring a mistrial.
This case differs from all of the cases cited above in that in this case, the defense requested an admonition and was denied one. However, as the above cases point out, when an admonition is not given, the error is not reversible where the evidence of the defendant's guilt is considerable. Given that three eyewitnesses identified the defendant in this case, the evidence of his guilt is considerable. The State did nothing to elicit the remark and did nothing further to emphasize his silence or to get the jury to make a negative inference. Under these facts, we find no merit to this assignment of error.
For the foregoing reasons, we affirm the defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] C.Cr.P. art. 770 provides in part:

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * * * * *
(3) The failure of the defendant to testify in his own defense; or
* * * * * *
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
[2] C.Cr.P. art. 771 provides:

Art. 771. Admonition
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person, other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.