734 So.2d 57 (1999)
STATE of Louisiana
v.
Fidelis OWUNTA.
No. 98-KA-0006.
Court of Appeal of Louisiana, Fourth Circuit.
March 31, 1999.
Rehearing Denied April 30, 1999.
Harry F. Connick, District Attorney of Orleans Parish, Joseph E. Lucore, Assistant District Attorney, New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
Dwight Doskey, Orleans Indigent Defender Program, New Orleans, Louisiana, Counsel for Defendant/Appellant.
Court composed of Judge STEVEN R. PLOTKIN, Judge JAMES F. McKAY III, Judge DENNIS R. BAGNERIS Sr.
BAGNERIS, Judge.
On August 7, 1996, defendant, Fidelis Owunta, was charged by bill of information with five counts of carnal knowledge of a juvenile in violation of La. R.S. 14:80. Defendant entered a plea of not guilty to all counts. On June 17, 1997, a jury acquitted him on counts one, two, three and five, and found him guilty as charged on count four. The trial court sentenced defendant to five years at hard labor, the sentence was suspended and defendant was placed on three years active probation. Defendant was ordered to serve fifty-two (52) weekends in parish prison.

*58 STATEMENT THE CASE

(Because the victim was fourteen years old at the time of the alleged crimes she will be referred to as "victim.")
Victim testified that defendant was a friend of her family's who taught her and her mother. One day in February of 1996, defendant gave victim a ride home after school, no one was home. Defendant asked victim if he could use her bathroom to which she agreed. After entering the house, victim went into the living room while defendant went into the bathroom. After defendant exited the bathroom he approached victim telling her how much he liked her and believed her feelings were mutual. Defendant forced victim to remove her underwear and began to apply cream to her vagina. Defendant had sexual intercourse with her. Defendant told victim not to tell anyone as no one would believe her. He also told her to bathe that night so she would not have an odor at school the following day.
Victim further testified that she did not attend school the next day because she felt ill. Defendant took notice of this and phoned victim's mother. He informed the mother that victim was scheduled to take a math test the next day and suggested that he come over after school to tutor her. That afternoon, defendant went to victim's home to tutor her, her mother was home, but she left shortly thereafter for work. After her mother left, defendant forced victim to have sexual intercourse. Defendant reminded victim he was the one in charge. Victim stated she felt intimidated by defendant. One week later another such incident occurred.
A fourth incident occurred on the Saturday prior to Mardi Gras. Defendant phoned victim's mother and asked if her family was going to the parade. Victim's mother informed defendant that everyone but victim was going. After victim's family left for the parade, defendant came to her house, but victim refused him entry. Defendant started crying and told victim he was sorry and it would not happen again. Victim let him in because she felt sorry for him. She showed him to the living room and then went to her bedroom and closed the door. Defendant followed. Defendant approached victim and removed her clothes. He then forced victim to have sexual intercourse.
The last incident occurred in April of 1996. Defendant offered to give victim a ride home from an academic function. Victim had called home in an attempt to have her mother pick her up, but no one was home. Victim accepted defendant's offer. Instead of taking victim home, defendant took her to a motel where they had sexual intercourse. Defendant then took her home.
At first, victim testified she did not tell anyone of the incidents with defendant, however, after some time she told her brother. Victim told her brother that she wanted to tell their mother, but she was afraid that her mother would not believe her. Instead, victim and her brother decided to confront defendant to have him admit to his indecent behavior. They invited defendant to their house where they tape-recorded their conversation with him. Defendant admitted to his relationship with victim and wanted to do something for victim to show that he was sorry.
Victim and her brother played the tape for their mother who contacted the police and took victim for a medical examination. Victim also underwent counseling. Victim stated that she had been a virgin before defendant molested her.
Victim's brother testified that he knew defendant as a family friend. Defendant taught both his sister and his mother. In April of 1996, victim told him about her relationship with defendant. She was very upset and cried. He told her she should tell their mother. In June of 1996, he and victim confronted defendant about the relationship. They tape-recorded the conversation they had with defendant. They did not threaten defendant. In the conversation defendant admitted to his relationship *59 with victim and expressed his sorrow for causing her pain. He offered to do something to alleviate the hurt he caused her.
Victim's brother testified that his barber had dated his older sister. He denied telling his barber that he was going to extort money from defendant.
Victim's neighbor testified she and victim's mother were very close friends. They had been neighbors for seven years. She had met defendant on one occasion, but she had seen his vehicle in front of victim's house on numerous occasions. On the Saturday before Mardi Gras, she saw defendant's vehicle outside the house. She knew victim was home alone. She called victim and told her that defendant should leave because her mother was not home. Victim agreed and hung up the phone.
New Orleans Police Detective Joseph Lorenzo met with victim and her mother on June 13, 1996. They gave him an audiocassette tape. After listening to the tape, the officer obtained an arrest warrant for defendant.
Victim's mother testified that victim's date of birth is July 15, 1981. In June of 1996, victim told her about the relationship with defendant. Victim played the tape for her. She heard defendant's voice on the tape, but did not listen to it in its entirety, as it upset her. She immediately arranged for counseling for her daughter.
Victim's mother was shocked by defendant's behavior. He had taught her at Southern University. She was pleased he was also teaching her daughter as she considered him intelligent and a good teacher. Defendant contacted her in late spring about victim attending a computer summer school at Southern University. When she told victim about the program, victim stated she did not want to attend. Victim told her about the relationship after this conversation. She did not recall having a conversation with defendant the Saturday before Mardi Gras, however, she acknowledged that victim never went to parades.
In April of 1996, victim participated in a literary rally at St. Mary's Academy. Victim told her mother she would be home around 11:30 a.m. When victim did not arrive on schedule, victim's mother went to the school looking for her, but was unable to find her.
One day, after she had reported defendant to the police, defendant approached her at Southern University and asked if they could settle the matter out of court. She denied she had spoken to defendant about needing a car or a home. She further denied that she authorized her children to negotiate with defendant for such items. She stated that she never left her daughter home alone with a man. She could forgive defendant for what he did to her daughter, but she could never trust him.
Victim's older sister testified that she dated her brother's barber for a few months. She denied she made comments to him that her siblings were trying to extort money from defendant. She knew defendant as a family friend, he taught her mother and sister. She learned of the cassette tape after the conversation had been taped; however, she did not listen to the tape. She was at home at when her siblings confronted defendant. Defendant was in the living room with them, their mother was at work. She was in her bedroom, but she walked into the living room when she heard yelling. Defendant was crying and appeared to be very upset.
Victim's sister further testified that her ex-boyfriend told her that victim had been experimenting with a vibrator. He told her that he received this information from victim. She was surprised because she did not know why victim would confide in him. She did not confront her sister about the matter. She believed there was something going on between victim and defendant. She had spoken to her mother about defendant coming over to the house. Her *60 mother spoke to defendant but he continued to visit.
Her ex-boyfriend called her house numerous times attempting to talk to her. He kept trying to find out information about the victim, but she never told him anything. She did not know if her brother ever spoke to him about defendant.
The barber testified that he was the ex-boyfriend of victim's sister and that he spoke with the victim and her brother about a scheme to extort money from defendant. He stated that his ex-girlfriend asked him to speak to her brother about defendant. He told the brother that he should leave defendant alone. When he did not get a response from the brother, he called defendant and informed defendant about his conversation with victim's brother. He acknowledged two prior convictions for forgery and theft.
Defendant testified that he did not have any sexual involvement with victim. He stated that he taught victim's mother at Southern University. He was very willing to assist her when she asked him to tutor victim in mathematics. In June of 1996, he received a phone call from victim asking him to come to her house. She claimed there was an emergency and her mother was not home. When he arrived at her house, victim and her brother attempted to extort money and other items from him. It was never his intent to provide them with money, a car and a house, but he agreed to these conditions because he was scared. He testified that there was a kitchen knife on the kitchen counter during their conversation, which he feared they would use to kill him. He also stated that victim was infatuated with him and had made passes at him. He told victim's mother, but she dismissed it as "puppy love."
The parties stipulated at trial that Dr. Rue, an obstetrician/gynecologist, examined victim on June 21, 1996. The medical examination could not confirm or deny prior sexual intercourse. The parties also stipulated that defendant's date of birth was November 11, 1953.

III. DISCUSSION AND RECOMMENDATION
A review of the record reveals no errors patent.
In his sole assignment of error, defendant alleges that the trial court erred when it excluded impeachment testimony of the barber regarding what the victim and her brother told the barber about an alleged plan to extort money from defendant. The trial court excluded such testimony as hearsay.
At trial, the victim and her brother testified that they did not attempt to extort money and gifts from defendant. They also testified they did not talk to the barber about the scheme. Victim's sister also testified that she was unaware of the scheme. Defense counsel attempted to impeach their testimony by introducing the testimony of the victim's brother's barber that he and the victim's brother, and he and the victim, had a conversation regarding the extortion scheme.
"Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La. C.E. art. 801(C). Generally, hearsay is inadmissible. La. C.E. art. 802. However, under limited circumstances certain types of hearsay are admissible to attack the credibility of a witness. La. C.E. art. 607. After laying a proper foundation, art. 607 allows a party to attack the credibility of a witness through the introduction of prior inconsistent statements. However, the witness at hand must have made the prior inconsistent statements, not another witness. See, State v. Mayeux, 639 So.2d 828 (La.App. 5 Cir.1994), State v. Jones, 648 So.2d 472 (La.App. 4 Cir.1994).
In the instant case there is no question that the statements made by victim and her brother to the barber were hearsay. *61 As required by La.C.E. art. 607 such statements were not prior inconsistent statements of the witness at hand, the barber, but of other witnesses. Thus, the trial court judge was correct in not admitting these statements as they are hearsay.
AFFIRMED.
PLOTKIN, J., dissents with reasons.
PLOTKIN, J., dissenting with reasons:
I respectfully dissent from the majority opinion because I believe the defendant did lay the proper foundation to allow certain witnesses to be impeached with their prior inconsistent statements. Specifically, I believe that Mark Fortier should have been permitted to testify regarding the alleged extortion scheme that he was allegedly informed of by Catina Williams and Derrick Williams.
The Louisiana Code of Evidence creates two exceptions for the allowance of prior inconsistent statements, La. C.E. 801(D)(1)(a) and La. C.E. 607; only the latter is relevant here. La. C.E. art. 607 allows the use of a prior inconsistent statement for impeaching the credibility of a witness, and such evidence is not substantive evidence. The relevant text of La. C.E. art. 607 is,
Art. 607. Attacking and supporting credibility generally
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
Also, La. C.E. art. 613 requires that before extrinsic evidence can be used to attack credibility, a proper foundation must be laid. That article states,
Except as the interests of justice otherwise require, extrinsic evidence of bias, interest, or corruption, prior inconsistent statements, conviction of crime, or defects of capacity is admissible after the proponent has first fairly directed the witness' attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so.
On cross-examination, the following colloquy took place between counsel for defendant and Derrick Williams:
Q: Do you know Mark Fortier?
A: Yes, I do know Mark Fortier.
Q: Tell the ladies and gentlemen of the jury who Mark Fortier is?
A: He's my barber.
Q: Didn't he date your sister?
A: Yes he did.
Q: Didn't it bother him that you were going to extort Professor Owunta?
A: No, it didn't.
Q: Did you ever talk to Mark Fortier about the fact that you were going to get a car and a house out of this deal?
A: No.
Q: Did you ever confide in Mark Fortier that even though there was no sex between your sister and Professor Owunta, you said you knew that he was rich and his wife was rich, and you were going to get a car and a house out of the deal?
A: No.
Q: Did you talk to Mark Fortier at all about this allegation?
A: No, I did not.
Q: Are you certain of that?
A: Yes, I am.
* * * * *
Q: So it's your testimony, and I want to be crystal clear, that you have never *62 discussed anything about this situation with Mark Fortier? Is that correct?
[The prosecutor than objected and trial court sustained on grounds that it had already been asked and answer.]
Under the standard set forth in La. C.E. art. 613, the "proponent has first fairly directed the witness' attention to the statement... and the witness has been given the opportunity to admit the fact and has failed distinctly to do so." Derrick Williams was given the opportunity to admit that he spoke to Mark Fortier about the extortion scheme and he denied so doing. At that point, it was permissible for the defense to use the testimony of Mark Fortier to impeach Derrick William's credibility.
The defendant, in his case-in-chief, called Catina Williams to testify. Again, on direct examination between counsel for defendant and Catina Williams, the proper foundation was laid to permit the impeachment of Catina William's credibility with her prior inconsistent statement to Mr. Fortier. The following is the relevant testimony:
Q: Do you ever remember calling on Mark and telling Mark you needed him to have a talk with your brother Derrick, because you thought Derrick was doing some things he shouldn't be doing?
A: No, I never told him to talk to my brother.
* * * * *
Q: Did you ever make reference to Mark that your brother and [Channel] were trying to extort some money or some cars out of Mr. Owunta?
A: No.
* * * * *
Q: So is there anything else that you had ever confided in Mr. Fortier about your family matters that he confided in you about your family matters other than that incident with your sister?
A: No. I just said I couldn't believe she would go to him.
Q: Did you ever confide in Mr. Fortier any particularly difficulty your sister was having with your brother, Derrick?
A: No.
Q: You are certain of that?
A: Did I ever talk to Mark about anythingany problem my sister and my brother were having?
Q: Yes.
A: No.
* * * * *
Q: Did you ever talk to him about any other accusations your sister made about being molested or raped other than the ones involving Mr. Owunta?
A: No.
Q: You did not?
A: I never talked to Mark about anything that was going on with Mark and Owunta?
Q: No, with Channel.
A: After that pointat that point Mark was telling me a whole lot of stuff I didn't know nothing about, and at that time I was only trying to get information from my sister and my brother, because nobody told me anything. I didn't found out nothing that was going on until after the tape was made.
* * * * *
Q: During this time when you were gathering information, did you ever learn from your brother or your sister that they were trying to force Professor Owunta to buy them a car or a house?
A: No.
Q: You never learned that through your investigation?
A: No.
Q: And you never shared that with Mark Fortier, your boyfriend?
A: I never shared that.
*63 Again, Catina Williams was asked several times if she ever spoke to Mark Fortier about what happened between her siblings and Mr. Owunta. Under La. C.E. art. 613, the door was open for her credibility to be impeached through the testimony of Mark Fortier. Thus, I believe it was error to prohibit the impeachment of Derrick and Catina Williams.
Confrontation errors are subject to a harmless error analysis. State v. Boswell, 96-801 (La.App. 3 Cir. 2/12/97), 689 So.2d 627, citing, Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). "The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination were fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt." Id. at 630. Based on the fact that the jury only convicted defendant of one count of carnal knowledge of a juvenile, it is apparent that the jurors did not fully believe the testimony of the victim. In fact, defendant was only convicted of the count that allegedly took place on the night of the Endymion parade. As evidence of that particular incident, the State presented the testimony of the victim's neighbor. She stated that she saw defendant's car in the driveway of the victim's house. This was the only count that the State was able to present collaborating evidence and the only count that the jury chose to believe the testimony of the victim; thus, attacking her credibility was crucial to the defendant.
Therefore, I cannot say that disallowing the defendant to impeach the testimony of Derrick and Catina Williams with their alleged prior inconsistent statements constituted harmless error.