|, KIRBY, Judge.

STATEMENT OF CASE

Alfred McQuarter was charged by dual bill of information on May 13, 1998. In count one, he was charged with attempted second degree murder, and in count two, with second degree kidnapping, violations of La. R.S. 14:(27) 30.1 and 14:44.1, respectively. Following a jury trial on May 3, 1999, the defendant was convicted of attempted manslaughter and second degree kidnapping. He was sentenced to twenty years, with benefit of parole, probation and suspension of sentence, with credit for time served for attempted manslaughter, and to twenty-five years, with two of those years without benefit of parole, probation or suspension of sentence for second degree kidnapping, sentences to run concurrently. That same day, the State filed a multiple bill, charging the defendant as a third felony offender. On July 21, 2000, the court adjudicated the defendant a second offender. The court vacated his sentence on the second degree kidnapping conviction, and re-sentenced him to twenty-five years, two of those years without benefit of probation, parole or suspension of sentence, sentence to run concurrently with his sentence on the attempted manslaughter conviction.

I .STATEMENT OF FACT

Irma Green, NOPD 911 operator, identified the tape recording of the April 3,1998, emergency call reporting the victim’s injuries.
On April 3, 1998, at approximately 2:30 p.m., Officer Edwin A. Dueote, Jr., responded to a 911 call from the Pizza Hut on Old Gentilly Road. When he arrived at the scene, he interviewed the victim, Marlene Walker, who supplied the suspect’s name, physical description, a description of the suspect’s vehicle, and told the officer that the suspect was armed. The officer followed the victim to the hospital to obtain more information, but due to her severe injuries, the victim was unable to respond to further questioning. He later learned that the suspect was arrested, and drove to the scene of the arrest. When he arrived, he observed that the defendant *1268 and his wrecked vehicle matched the descriptions supplied by the victim.
Ms. Cynthia Mitchell, a Mend of both the victim and the defendant, accompanied the victim on April 3, 1998, to look for the victim’s car. They located the car at “Unk’s” house, and observed the defendant removing the vehicle’s tires. At that point, Ms. Mitchell rode home with another friend. As Ms. Mitchell left, the victim begged her not to go. She saw the victim the next day, severely injured, extensively bruised, and bandaged.
The victim testified that she and the defendant were romantically involved several years ago, and have a ten-year-old daughter. Over the ensuing years, they have remained friends and supportive of one another. On the morning of the incident, the defendant told the victim he had made arrangements with “Freddie” at the service station to repair brakes on her car in exchange for rock cocaine. The defendant took the victim’s car, and left his vehicle for her use that day. Later in|athe morning, she learned her car was at “Unk’s crack house”. After several unsuccessful attempts to locate her car, she and her friend, Cynthia Mitchell, found the defendant working on her car at “Unk’s” house. The defendant had removed the tires and stereo equipment from her vehicle. The victim and defendant engaged in a brief discussion about the condition of her vehicle. The defendant walked into “Unk’s” house, returned with a gun, and ordered the victim to get into his car. The victim complied, and as the defendant drove, he beat her on the head and threatened to kill her. At one point, the defendant stopped his car, and ordered her to get out. As she walked down the street, the defendant drove his car in front of her, jumped out, knocked her to the ground, and proceeded to beat and kick her. He threw her back into the car, and sped away. As the car entered the interstate highway entrance ramp, the defendant threw her from the car. She became tangled in her purse, which remained wedged in the car, causing her to be dragged along side the speeding vehicle, until she was able to release herself. As she lay on the roadside, the defendant backed up, attempting to roll over her. She ran to a nearby Pizza Hut, where she asked the personnel to the lock the door and call the police. An ambulance transported her to Charity Hospital for treatment. She remained in the hospital for a few hours. Her injuries have left her body extensively scarred. After his arrest, the defendant told her that if she did not drop the charges, he would have her killed.
On the afternoon of April 3, 1998, Larry Jones witnessed the defendant hit the victim, knock her to the ground, kick her, and then force her into his vehicle.
Ms. Hilda McQuarter, the defendant’s mother, testified that the victim called her about the incident, and said she did not want to proceed, but the District Attorney would not allow her to drop the charges. The victim asked that either Ms. biMcQuarter or her daughter accompany her to drop the charges. Ms. McQuarter made arrangements for her daughter to accompany the victim, but the victim never dropped the charges.
The defendant’s sister, Ms. Sherry Hawkins, testified that the victim and defendant have a daughter. When Ms. Hawkins spoke to the victim after the incident, the victim told her about the car repairs performed by the defendant. As the victim related the incident, she told Ms. Hawkins that the defendant was very agitated that day, and was speeding. The victim said she voluntarily got out of the defendant’s car because he was driving too fast.
Mr. Leon Gilbert, a/k/a “Unk”, testified that he and the defendant are long time friends. He refuted the victim’s assertions *1269 that his house was a “crack house”. On April 3, 1998, the defendant asked permission to work on the victim’s car at Mr. Gilbert’s house. Although the defendant removed the tires to repair the brakes, he did not remove stereo equipment from the car. The victim and the defendant left the house together, with the victim at the wheel. The defendant did not show any hostility toward the victim, nor did he threaten her with a gun.

ERRORS PATENT

A review for errors patent on the face of the record reveals none.

ASSIGNMENT OF ERROR NUMBER 1

In his first assignment, the defendant claims the trial court erred in allowing the State to introduce the 911 tape and NOPD complaint history of this incident, thereby prejudicing him. The defendant maintains that the evidence is irrelevant | ¡¡hearsay, that he was not provided copies through discovery, and that he was denied his right to cross-examine the caller on the tape.
Prior to trial, defense counsel objected to use of the evidence, complaining: DEFENSE COUNSEL:
... the other discovery we just received this morning was we were informed that there’s a 911 tape. Actually, there are two phone calls made from the Pizza Hut. And apparently, according to the prosecutor, the victim is heard in the background crying while somebody calls 911. Now, we’ve only had chance to listen to that one time. It really doesn’t give me sufficient opportunity to prepare for the introduction of that evidence, because I don’t have the time to properly evaluate it and its significance in the case and its admissibility in the case. I object to its admissibility...
The State responded:
_the issue of the 911 tape. The very first paragraph of the incident report which counsel was provided states that the police officers received a call, a signal, coming from the Pizza Hut at 4445 Old Gentilly road. I’m not sure how [defense counsel] will argue that he didn’t realize that there was a call made to police when the very first paragraph of the incident report talks about that call, the incident report that he has had since this case was instituted against his client. And, furthermore, I just have to state for the record while — for the record that no formal discovery was filed in this case. Therefore, I had no way of checking what had been turned over to [defense counsel] ...
... the issue of the complaint history. And that — I would submit on my argument that goes with the 911 tape that his — the complaint history is a written form of the tape. It is composed when the 911 operator types out the information that she is verbally hearing which is all on the tape. And, therefore, I would submit on my argument with the 911 tape. That is all part of the 911 issue. The judge ruled:
|fiI disagree with [defense counsel]. This case has been pending since May 13th of 1998. It’s been set many times for trial, many times for pre-trial. Starting over a week ago, close to two weeks, we began discussing that this case was going to go to trial, that it was a must-go trial date today. I find that the 911 tape and corroborative complaint log of that tape present no significant material to change or affect defense strategy, that in fact it is contained in the first paragraph of the incident report that there was a 911 call relating the facts of the Pizza Hut call...
La.C.E. art. 401 defines relevant evidence as evidence having any tendency to make the existence of any fact that is of *1270 consequence to the determination of the action more probable or less probable than it would be without the evidence. La.C.E. art. 402 provides that all relevant evidence is admissible; but, La.C.E. art. 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or waste of time. In determining the relevance of evidence, much discretion is afforded the trial judge. State v. Stowe, 635 So.2d 168 (La.1994).
The defendant maintains that the only issue for the jury to decide was whether the victim jumped or was pushed from the vehicle. He contends that the State’s only purpose in playing the 911 tape was to inflame the jury over the defendant’s injuries, and to prejudice his defense.
Examining the context under which the tape was introduced, it is clear from the prosecutor’s questions and the responses from NOPD Emergency Operator Irma Green, the State’s only purpose in introducing the tape and complaint history was to explain police involvement.
|7Even assuming that there was a discovery violation, the State’s failure to comply with discovery rules does not bring automatic reversal; prejudice must be shown. State v. Schrader, 518 So.2d 1024, 1031-32 (La.1988). On the issue of injuries, the jury heard the victim and every witness testify that the victim was injured. As to whether the victim jumped or was pushed from the defendant’s vehicle, the victim testified in no uncertain terms that the defendant pushed her, and meant to kill her. The defense offered no credible evidence to contradict the victim’s statements.
There is nothing in the record to suggest that the judge abused her discretion in admitting the 911 tape and the complaint history or that that evidence prejudiced the defendant. This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 2

In his second assignment, the defendant argues the trial court erred in denying his motion for mistrial. He asserts that the State’s eliciting testimony from the victim by which she referred to Leon Gilbert’s house as a “known” crack house and to the defendant’s drug use and “drug ways”, amounted to inadmissible other crimes and bad character evidence. He claims these errors deprived him of a fair trial.
Apparently, defense counsel lodged objections to those portions of the victim’s testimony at a bench conference, thereby preserving them for appellate review. La. C.Cr.P. art. 841. Arguably, the trial court erred in admitting the evidence; however, the error was harmless.
In order for an error to be harmless, it must be shown beyond a reasonable doubt that the complained-of error did not contribute to the verdict. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As a trial error, as opposed to a structural error, it may be quantitatively assessed in the context of the other evidence presented. Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993).
Through direct examination of defense witness, Leon Gilbert, Jr., aka “Unk”, defense counsel refuted the victim’s “crack house” comment:
*1271 Q. Okay. Mr. Gilbert, let me show you what’s been introduced into evidence as State’s Exhibit Four-C. Can you tell me what’s in that picture there?
A. That’s my home.
Q. That’s your house?
A. Right.
Q. Is that your crack house?
A. Crack house?
Q. Is that a crack house where you live?
A. No, indeed not.
As for the testimony concerning the defendant’s alleged drug use, the victim testified that during their two-year liaison, the defendant regularly used drugs. There was no testimony to refute the victim’s allegation. Moreover, although the defendant was charged with attempted second degree murder, the jury returned a lesser-included verdict of guilty of attempted manslaughter. The jury found the | defendant less culpable than he was charged. Thus, it does not appear that the jury was influenced by the allegations of a “crack house” and defendant’s drug use.
This assignment is without merit.

CONCLUSION

We affirm the defendant’s conviction and sentence.

AFFIRMED.