MICHAEL E. KIRBY, Judge.
| .STATEMENT OF CASE[1]
On May 13, 2004, defendant, Ricky Valentine, was charged by indictment with the first degree murder of Linda Johnson while in the perpetration or attempted perpetration of an aggravated burglary. The defendant pled not guilty at his arraignment on May 25, 2004 and after a five day jury trial on June 7-11, 2004, he was found guilty of second degree murder. On August 12, 2004, defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant’s oral motion for appeal was granted. After the sentencing hearing, he filed motions for new trial, post verdict judgment of acquittal and post verdict modification of verdict. On August 19, 2004, the trial court set aside the sentence imposed on August 12, 2004 and the court considered the motions. All were denied. The defendant waived all legal delays and was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
I STATEMENT OF FACT
Officer Yvonne Farve responded to a call at 2826 Clara Street, Apartment E, in the early morning hours of September 15, 2000. When she arrived on the scene, she knocked on the door but no one answered. The door had to be forcibly opened. Once the door was opened, the officer found a woman, in a seated position behind the door, bleeding from the back of her head and right abdomen. The officer tried to render aid, but the victim was unresponsive. The officer then requested an emergency unit. The victim was later identified as Linda Johnson. Officer Farve noted, upon viewing the scene, that the air conditioning unit had been pushed out of the window and was on the floor. The window above the air conditioning unit was open. The officer noted that there was water on the window ledge. When the emergency unit arrived, the medics rendered aid to the victim and transported the victim to the hospital. The officer spoke with the victim’s children. She also requested a crime lab unit be sent to the scene. The officer then turned over the case to Detectives Crowden and Johnson.
Officer Karl Palmer, a technician with the New Orleans Police Department Crime Lab, was called out to he scene at 2826 Clara Street. The officer sketched the layout of the apartment. He noted that there were two drops of blood on the living room floor.
Detective Bernard Crowden was the lead detective who investigated the case. When he arrived on the scene, the victim had been transported to the hospital. The victim’s four children (ages seven, nine, eleven, and thirteen) were still on the scene. A witness who lived across the street from the victim was located. The officer took statements from the witness, Eteria Nelson, and the victim’s children. Detective Crowden noted that the air con *782 ditioning unit was on |sthe floor inside the residence. The officer also observed that there was water and condensation on the window ledge. He did not observe footprints in the area around the water. Detective Crowden stated that he did not see any watermarks in the apartment.
After Detective Crowden returned to the Sixth District office, he learned that the defendant, Ricky Valentine, was at Central Lockup. Detective Crowden went to Central Lockup and picked up Valentine. Valentine asked the officer if the victim, Linda Johnson, was dead. Ms. Nelson identified the defendant in a photographic lineup as the person she saw climbing into the victim’s residence during the early morning hours of September 15, 2000. A search warrant was obtained for the defendant’s mother’s house. A red backpack containing the defendant’s driver’s license and other items belonging to the defendant was found during the search. The driver’s license listed defendant’s mother’s address as defendant’s address. Defendant’s clothing tested negative for blood and gunpowder. Detective Crowden noted that there were no signs of a struggle on the defendant, i.e., there were no scratches or bruises. The defendant was initially arrested for attempted first degree murder. However, when it was learned that the victim had died at the hospital, the defendant was re-arrested for first degree murder. The victim died from three gunshot wounds — one to the head, one to the buttocks and one to the abdomen.
The officer obtained a copy of the apartment lease from the Housing Authority of New Orleans. The parties listed on the lease agreement were the victim, Linda Johnson, and her four children. The defendant was not listed on the lease agreement.
| ¿Officer Jeffrey Wall and his partner, Officer David Osborne, were on their way to the Second District station when they saw a child, later identified as Paul Johnson, wearing only a shirt and underwear, running down Napoleon Avenue. The officers pulled their vehicle next to the child and blew the horn. The child then began flagging the officers down. After speaking with the child, the officers learned that a COPS[2] unit was handling a call of an aggravated battery by shooting. The COPS unit informed the officers that they had the scene under control and requested that the officers relocate to the scene with the child. When the officers arrived on the scene, they observed the victim being placed into an ambulance. The officers attempted to console the child, who was very emotional. The officers handed the child over to the detectives handling the case.
Dr. Richard Tracy performed the autopsy on the victim, Linda Johnson. The autopsy revealed that the victim had been shot three times. The first and fatal shot entered the victim above and behind the right ear. Bullet fragments were found in the victim’s head. The second wound entered near the lower end of the spine, traveled through the kidney and liver, and ended beneath the skin. The bullet from the second wound was retrieved during the autopsy. The third wound was a flesh wound to the right buttock. The bullet passed through soft tissue under the skin and exited in front of the hip. All three wounds entered from the back of the body. Dr. Tracy testified that he would not expect much external bleeding from the gunshot wounds. The gunshot wound to the head would not bleed out but there would be bleeding inside the head. The gunshot wound in the abdomen damaged the kid *783 ney and liver but did not leave any route for blood to escape the body. The blood 1 saccumulated in the body cavity. The flesh wound to the buttock caused no significant injury, and there would be no blood from that wound.
Officer Kenneth Leary, a firearms examiner with the New Orleans Police Department Crime Lab, examined the bullets and fragments recovered during the victim’s autopsy. Officer Leary was unable to determine if the bullets, .38 caliber, were fired from the weapon found on the premises due to the deformity of the bullets.
Caroline Johnson was seven years old when her mother, Linda Johnson, was killed. On the night of the incident, September 15, 2000, Caroline, her mother, her sister, Cassandra, and her two brothers, Paul and Jeremiah, were sleeping in the front room of their apartment. The children were sleeping on mattresses on 'the floor and Linda Johnson was sleeping on the sofa. Caroline awoke when she heard noise coming from the air conditioning unit. She saw the air conditioning unit fall on the floor and a man coming in through the window. She recognized the man as the defendant, her mother’s boyfriend. The defendant was carrying a burgundy backpack and holding a gun. Cassandra grabbed Caroline’s hand and they ran into the bathroom with their brother, Jeremiah. Cassandra locked the bathroom. Caroline saw Paul, her older brother, run through the back door. After the defendant left, Caroline and her siblings came out of the bathroom. Her mother was lying by the front door, unable to walk or talk. Cassandra then called 911. Caroline testified that the defendant had been staying with them but that her mother had just broken up with the defendant.
Jeremiah Johnson, the victim’s youngest son, was nine years old at the time of the incident. He, his mother and his siblings were sleeping in the front room of their apartment when he heard noise from the air conditioning unit. He awoke to |fifind the defendant pushing the air conditioning unit out the window. Jeremiah saw the defendant holding a backpack and a gun. He and his two sisters ran into the bathroom. Jeremiah’s older brother, Paul, ran out the back door. While he was in the bathroom, he heard gunshots. After hearing the front door slam shut, Jeremiah and his sisters came out of the bathroom. His mother was lying on the side of the front door. She was bleeding and immobile. Cassandra called the police. Jeremiah stated that his mother and defendant were dating but they had broken up shortly before the incident.
Paul Johnson, the victim’s oldest child, testified that he was awakened by the defendant’s voice. He heard the defendant calling his mother’s name. The defendant was standing outside the window, holding a gun. The defendant had pushed the air conditioning unit out of the window. When the defendant started shooting, Paul ran out the back door of the apartment to get help. Paul ran down Napoleon Avenue and flagged a police officer. The police officer took Paul back to his house. Paul testified that the defendant did not live with them. He also stated that he did not see the defendant and his mother struggle for the gun.
Eteria Nelson lived across the street from the victim. Her bedroom window faces the victim’s apartment. On the night of the incident, Ms. Nelson had left her bedroom window open. She woke when she heard noise outside. Ms. Nelson saw a man push an air conditioning unit out of a window and climb through the window. She then heard gunshots. A few minutes later, Ms. Nelson saw the same man exit the apartment from the front door and *784 walk down the steps. Ms. Nelson identified the defendant as the man she saw entering the victim’s apartment from the window and leaving the apartment through the front door.
RSergeant Carlos Louque of the Orleans Parish Criminal Sheriffs Office was on duty on September 15, 2000. Sergeant Louque was advised that a man had arrived at Central Lockup and wanted to turn himself in on a murder charge. The officer went to Intake and Processing and met the defendant. The defendant told Sergeant Louque “he did a murder” and “wanted to turn [himjself in.” The officer asked the defendant when and where the murder occurred. The defendant answered that he did not remember. Sergeant Louque then ran the defendant’s name through the computer and could not find any outstanding warrants. Noting that the defendant’s address was listed as Third Street, the officer called the Second District. Sergeant Louque was informed that there had been a shooting in the Sixth District. The officer from the Second District called Louque back and informed him that the defendant was wanted in regards to a shooting in the Sixth District and that officers from the Sixth District would be coming to pick up the defendant. When the Sixth District officers arrived, the defendant was arrested and placed in handcuffs.
Ricky Valentine testified on his on behalf. He acknowledged that he had fourteen prior convictions for simple robbery. He stated that he and the victim, Linda Johnson, had been involved for four years and lived together for three years. They became engaged in 2000. Valentine testified that he was self-employed as a trucker. ■ He arrived home, at the victim’s apartment, around 2:30 a.m. from a job. He entered the house from the front door, with a key, and noticed that Linda was sleeping on a mattress on the floor in the front room. The television was on. Linda got up and went to the bathroom. When she came back, she questioned him about his whereabouts. They quarreled, and she told him to leave. He went to take the air conditioning unit out of the window. The defendant testified that he purchased | sthe unit. When he turned around, Linda was reaching for a gun in her closet. The defendant dropped the air conditioning unit and lunged toward Linda. They struggled and shots were fired. The defendant stated that Linda had firm control over the gun. After the shots were fired, Linda fell to the floor. The defendant told the children to stay in the apartment and he would go get help. He did not believe the telephone in the apartment was working. He ran down the stairs and headed towards a grocery store on Washington Avenue to call the police. When he turned around he saw Paul standing on the steps, holding the gun. This frightened defendant so he ran to his mother’s house and told her what happened. His mother and brother then took him to Central Lockup. When he arrived at Central Lockup, he refused to speak with anyone. The defendant admitted that his driver’s license, which was issued in June, 2000, listed his address as Third Street. He also acknowledged that he was not listed on the lease for the victim’s apartment.

ERRORS PATENT

A review of the record for errors patent reveals none.

DISCUSSION

ASSIGNMENT OF ERROR NUMBER 1

In his first assignment of error, the defendant argues that the trial court erred when it refused to instruct the jury on the law of negligent homicide.
La.C.Cr.P. article 807 provides:
*785 The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges |ato the other party when the charges are submitted to the court.
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
La.C.Cr.P. article 802 provides that the court shall charge the jury as to the law applicable to the case. La.C.Cr.P. article 808 states that “[w]hen a count in an indictment sets out an offense which includes other offenses of which the accused could be found guilty under the provisions of Article 814 or 815, the court shall charge the jury as to the law applicable to each offense.”
Negligent homicide is defined in LSA-RS 14:32 as follows:
§ 32. Negligent homicide
A. Negligent homicide is the killing of a human being by criminal negligence.
B. The violation of a statute or ordinance shall be considered only as presumptive evidence of such negligence.
Criminal negligence is defined by LSA-R.S. 14:12, to wit:
12. Criminal negligence
Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
Under La.C.Cr.P. article 814, negligent homicide is not a responsive verdict to first degree murder. As a general matter, a trial judge has the duty to instruct jurors as to “every phase of the case supported by the evidence whether or not accepted by him as true,” and that duty extends to “any theory ... which a jury Imcould reasonably infer from the evidence.” La.C.Cr.P. article. 802; State v. Marse, 365 So.2d 1319, 1323 (La.1979); State v. Johnson, 438 So.2d 1091, 1097 (La.1983)[3]; State v. Goodley, 01-0077 (La.6/21/02), 820 So.2d 478, 482. In State v. Johnson, 438 So.2d at 1097, the Supreme Court held that the defendant was not entitled to a negligent homicide instruction because “[t]he defendant simply did not present any evidence which could fairly support a defense of negligent homicide.”
In the present case, defendant relies on his testimony that there was a struggle for the weapon and that the weapon fired during the struggle in support of his argument. In making this argument he seems to try to bring himself within the purview of State v. Williams, 606 So.2d 1387 (La. App. 2d Cir.1992). In that case Williams was convicted of second degree murder upon the following facts: He and a friend drove to Lisa Webb’s house where they encountered several people standing in the yard. As the defendant walked into the yard, the victim struck him knocking him to the ground. After he was assisted to his feet defendant returned to his vehicle and obtained a handgun. There was conflicting testimony as to what happened *786 upon defendant’s re-entry into the yard. Some witnesses said the defendant walked up to the victim and fired the gun, hitting him in the chest; others testified the victim grabbed for the gun which then discharged. There was some testimony that defendant and the victim engaged in a “tussle” prior to the shot. The defendant told a witness that he thought the gun was on safety when he returned to the yard.
At trial the defendant asked for a jury charge on negligent homicide but the trial court refused to give it since it found the charge was not supported by the Inevidence. However, the Second Circuit disagreed finding that the testimony about the victim grabbing for the gun prior to its discharge, the “tussle” and the defendant’s statement immediately after the incident to the effect that he thought the gun was on safety gave some support to a finding of negligent homicide. It reversed the conviction and remanded the case for a new trial.
The only similarity between Mr. Valentine’s case and the Williams, supra, case is that Mr. Valentine claims there was a struggle or “tussle”.
Here, the eyewitness testimony and medical evidence refute the defendant’s theory of a negligent homicide. The victim’s children testified that the victim did not struggle with the defendant. They stated that the defendant shot the victim from the window. Further, Dr. Tracy testified that the gunshot wounds sustained by the victim entered from the back. Dr. Tracy opined that there was no possibility that the victim could have inflicted the wounds on herself during a struggle. The only testimony concerning a struggle came from the defendant, but unlike in Williams, here the defendant asserts the victim always had the gun. According to his own testimony defendant never had the weapon.
We find that the outcome of this case is governed by State v. Johnson, supra, where the Supreme Court found the defendant’s evidence not probative of criminal negligence.
In the case sub judice the testimony, including that of the defendant, is bereft of any evidence that the defendant was negligent, much less grossly negligent. His testimony could have possibly served as a foundation for self-defense, but there is no criminal negligence aspect to such a defense. On the contrary, one has a privilege to defend one’s self. The mere fact that there was a tussle does not automatically entitle defendant to a negligence homicide charge.
hpThere was no evidence presented to the jury from which it could have concluded that the defendant’s conduct was in such disregard of the interests of others that it amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.
As there was no evidence from which the jury could infer that the defendant was guilty of negligent homicide, the trial court correctly denied the defendant’s request to charge the jury on the issue of negligent homicide.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 2

The defendant also contends that the trial court erred when it failed to grant his request for a mistrial based upon the prosecutor’s reference to his post-arrest silence. The reference occurred during opening statements.
Under La.C.Cr.P. article 771, when the prosecutor or a witness makes a reference to a defendant’s post-arrest silence, the trial court is required, upon the request of the defendant or the State, to *787 promptly admonish the jury. In such cases where the trial court is satisfied that an admonition is not sufficient to assure the defendant a fair trial, the court may grant a mistrial upon motion of the defendant. State v. Kersey, 406 So.2d 555, 559 (La.1981). The granting of a mistrial is within the discretion of the trial court if the trial court is satisfied that an admonition is not sufficient to assure the defendant a fair trial. State v. Procell, 365 So.2d 484, 491 (La.1978), cert, denied, 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046 (1979). A brief reference to a defendant’s post-arrest silence does not mandate a mistrial or reversal when the trial as a whole was fairly conducted, the proof of guilt is strong, 11sand the prosecution made no use of the silence for impeachment purposes. State v. Ledesma, 01-1314 (La. App. 5 Cir. 4/30/02), 817 So.2d 390.
In State v. Smith, 336 So.2d 867 (La. 1976), the defendant’s motion for mistrial was based upon a comment made by the prosecuting attorney during the direct examination of the arresting officer in an attempt to summarize the officer’s testimony. The prosecutor stated that the defendant had refused to give a statement when he was under custodial arrest. The Supreme Court found that the reference by the prosecutor was incidental and inadvertent and there was no indication of the deliberate intent of the State to inject or exploit the issue, and held that the trial court did not abuse its discretion in denying the motion for mistrial.
In State v. Olivieri, 03-563 (La.App. 5 Cir. 10/28/03), 860 So.2d 207, the defendant challenged the comment made by the State in its opening statement referencing defendant’s post-arrest silence. The prosecutor commented in the opening statement, “And then when Agent Riker asked him about the rapes, the Defendant decided he didn’t want to talk any more.” The Fifth Circuit found that the comment did not warrant reversal of the defendant’s conviction. The court stated:
The prosecutor’s reference to defendant’s post-arrest silence during opening statement was brief. The record shows the State’s opening statement was approximately 18 pages and only one sentence out of the 18 pages referenced defendant’s post-arrest silence. There is no indication that the brief reference by the prosecutor was a deliberate attempt to inject or exploit the issue. The remark was made at the beginning of a three-day trial and there is no indication the State attempted to stress or make continued references to defendant’s post-arrest silence. Additionally, the evidence against defendant was overwhelming. Defendant admitted he kidnapped and robbed the victim. His DNA matched the DNA found in the semen stains |ulocated ⅛ the victim’s car and his fingerprint was found on an item in the victim’s car.
The record shows that the trial as a whole was conducted fairly and defendant’s guilt was overwhelming. Under these circumstances, a mistrial was not warranted. While defendant was entitled to an admonishment for the prosecutor’s improper remark, defendant did not request it. Nonetheless, the failure of a trial court to admonish the jury is considered harmless’ error when there is considerable evidence of the defendant’s guilt. See, State v. Jones, 94-0926 (La. App. 4 Cir. 12/28/94), 648 So.2d 472, 480, writ denied, 95-0272 (La.6/16/95), 655 So.2d 346; State v. Stelly, 93-1090 (La. App. 1 Cir. 4/8/94), 635 So.2d 725, 729, writ denied, 94-1211 (La.9/23/94), 642 So.2d 1309; State v. Smith, 336 So.2d 867, 869-870 (La.1976).
Olivieri, 03-563, pp. 12-13, 860 So.2d at 214-215.
*788 An error is harmless, when it can be shown beyond a reasonable doubt that the complained-of error did not contribute to the verdict. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); State v. McQuarter, 2000-1553 (La.App. 4 Cir. 6/6/01), 788 So.2d 1266.
In the case at bar, the prosecutor made the following comment during opening statements:
At some point, Ricky Valentine is brought into the sub-station where Detective Crowden is and Detective Crow-den gives Mr. Valentine an opportunity to make a statement if he chooses. He didn’t have to. He didn’t want to make a statement but he did ask one question.
Thereafter, the defendant immediately sought a bench conference and requested a mistrial. The trial court did not rule on the defendant’s motion at that time and h sallowed the prosecutor to continue her opening statement. When the prosecutor continued her opening statement, she stated “at some point, Ricky Valentine was brought to Detective Crowden and at that point, Ricky Valentine made a statement to Detective Crowden, ‘Is she dead.’ That was his statement.” The prosecutor made no other statements about the defendant’s post-arrest silence. Later, the trial court denied the request for a mistrial, finding that the statement was not a comment on the defendant’s failure to testify.
The prosecutor’s brief remark about the defendant not wanting to give a statement does not mandate a mistrial or reversal of the conviction. As the trial court noted, the prosecutor’s remark was meant to bring attention to a statement the defendant made, not that defendant did not make a statement. The prosecutor sought to bring attention to the fact that the defendant wanted to know if the victim had died. This evidence was brought out during trial through examination of Detective Crowden, to which the defendant did not object. As in Smith, the prosecutor’s statement was incidental. There was no indication of a deliberate intent to focus on the defendant’s post-arrest silence. In fact, the prosecutor’s comments were meant to focus on the question the defendant posed to Detective Crowden. The trial court did not abuse its discretion when it denied the defendant’s motion for mistrial.
Further, assuming that the trial court committed error in failing to admonish the jury, such error was harmless. The prosecutor’s comment did not contribute to the jury’s verdict, as there was substantial testimonial and physical evidence of the defendant’s guilt. The defendant admitted to Sergeant Louque that he committed a murder. The victim’s oldest child testified that he saw the defendant shoot his mother without provocation. The other children testified that they saw the | 1fidefendant enter the apartment through the window, holding a gun. Ete-ria Nelson, the victim’s neighbor, also testified that she saw the defendant enter the apartment through the window, heard gunshots, and then saw the defendant leave the apartment through the front door. Dr. Tracy stated that the victim sustained three gunshot wounds: one to the back of the head, one to the abdomen, and one to the buttocks. Dr. Tracy further testified that the victim could not have inflicted the gunshot wounds on herself, with or without a struggle.
*789 This assignment of error is without merit.

CONCLUSION

For the above reasons defendant’s conviction and sentence are affirmed.
AFFIRMED.

. The defendant was previously charged in another indictment with first degree murder, as there are references in the transcript concerning the nolle pressing of another case. Further, the appeal record contains the transcript of a suppression hearing held on November 7, 2001, which was held before the present indictment was filed. The transcript of the suppression hearing bears Criminal District Court case number 418-106, Section "E."

. Community Oriented Police Services

. The Fifth Circuit in State v. Cedrington, 98-253 (La.App. 5 Cir. 12/16/98), 725 So.2d 565, noted that jurisprudence established in State v. Johnson on the issue of sequestration was superseded by rule.