| STATE OF LOUISIANA | * | NO. 2019-KA-0743 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| BRENT M. BRANEON SR. | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 481-878, SECTION "K"
Honorable Arthur Hunter, Judge
* * * * * *
**Judge Terri F. Love**
* * * * * *
(Court composed of Judge Terri F. Love, Judge Regina Bartholomew-Woods, Judge Tiffany G. Chase)

**BARTHOLOMEW-WOODS, J., CONCURS**

Leon Cannizzaro
District Attorney
Kyle Daly
Assistant District Attorney
ORLEANS PARISH
619 S. White Street
New Orleans, LA 70119

     COUNSEL FOR STATE OF LOUISIANA/APPELLEE

Kevin V. Boshea
ATTORNEY AT LAW
2955 Ridgelake Drive, Suite 207
Metairie, LA 70002

AND

Davidson S. Ehle III
MARINO & EHLE, LLC
501 Derbigny Street
Gretna, LA 70053

     COUNSEL FOR APPELLANT/DEFENDANT

**AFFIRMED**
**February 5, 2020**

Defendant Brent Braneon, Sr., ("Defendant") seeks review of his convictions and sentences for armed robbery and second degree murder. On appellate review, we find the evidence presented at trial was sufficient to support the jury's guilty verdicts on the charged offenses. Additionally, the investigating detective's testimony at trial that Defendant refused to speak to him or the detective's misstatement that Defendant confessed to him, which was not only corrected but also stricken, did not attribute to the guilty verdicts in this case. Therefore, we also find no abuse of the trial court's discretion in denying Defendant's motions for mistrial. Accordingly, we affirm Defendant's convictions and sentences for armed robbery and second degree murder.

## PROCEDURAL HISTORY AND FACTUAL BACKGROND

At trial, Jane Wolfe testified that in 2008 her husband Roy Wolfe ("Mr. Wolfe") was in the business of renovating houses, and her cousin Eddie Raskin ("Mr. Raskin") performed all the air conditioning work that was needed. One of the homes her husband was renovating was located at 1704-1706 South Lopez Street in New Orleans. In July 2008, the renovation of the South Lopez property was almost complete, and on the day Mr. Wolfe went missing, he and Mr. Raskin

were installing the air conditioning unit.

Mr. Raskin testified that on the day in question, he was alone at the property having sent Mr. Wolfe to obtain supplies that he needed to complete the work. While alone at the house, Mr. Raskin testified that he was approached by two men armed with guns. Mr. Raskin stated that he was talking on the phone when a man in a white tee-shirt and shorts, later identified as Alonzo Gonzales, armed with an automatic gun, walked through the front door, stuck the gun to his head, and instructed him to stop talking and took the phone out of his hand. A second assailant entered the house through the back door wearing a red shirt. When asked at trial about the identity of the second man wearing the red shirt, Mr. Raskin pointed to Defendant sitting in the courtroom.

With a gun at his head, Gonzales asked Mr. Raskin where the man with the truck was. At trial, evidence was presented that Mr. Wolfe drove a silver Chevy Silverado truck. Defendant and Gonzales then forced Mr. Raskin to lie in a closet and later in a bathtub while Defendant held him at gunpoint. Mr. Raskin estimated he was in the bathroom for a total of 30 minutes, during which Defendant was with him almost the entire time, sitting three feet away on the toilet. At trial, Mr. Raskin stated that he saw Defendant's face "clear as day," as neither of his assailants were wearing masks, hats, or hoodies.

When Mr. Wolfe returned to the house, Gonzales alerted Defendant, who then led Mr. Raskin at gunpoint out the back of the house and through an alleyway. From the alleyway, Mr. Raskin could see Gonzales approach Mr. Wolfe on the front porch in an apparent attempt to distract Mr. Wolfe, at which point Defendant opened fire on Mr. Wolfe and chased him. Mr. Raskin ran back through the alleyway and jumped a gate, and later told police he heard numerous shots fired.

He stated he did not know what occurred after that because he was running away from the shooting.

After fleeing the scene, Mr. Raskin encountered a construction crew and borrowed a telephone to call 911. The call was published for the jury and on the call, the suspects were described as two black males, one was wearing a white tee shirt, the other a red-collared shirt and both had "long dreads." It was also reported that the suspects fled in a blue vehicle.

Officer Nicole Honore Daliet ("Officer Daliet") testified that she was one of the officers who responded to the armed robbery 911 call. She stated that on that date, she proceeded to South Salcedo and Eden Streets, which was where the victim Mr. Raskin was located. After meeting the person who placed the call, Officer Daliet relocated to 1704-1706 South Lopez Street, where the crime actually occurred. When police arrived, Mr. Wolfe's truck was gone, and Mr. Wolfe was nowhere to be found.

Photographs of the scene were shown to the witness who confirmed that a semiautomatic weapon was found outside the house. Upon observing the weapon, crime scene technicians were called to the scene. On cross-examination, Officer Daliet confirmed that she met with the armed robbery victim, Mr. Raskin, who provided her with descriptions of the perpetrators and descriptions of the weapons they wielded.

Mr. Wolfe's wife, Jane ("Mrs. Wolfe"), testified that she first suspected something was wrong when her father informed her that Mr. Wolfe was not answering his phone. When her calls to him proved unsuccessful, Mrs. Wolfe went to the South Lopez property. Neither her husband nor Mr. Raskin was there; however, she noticed one of the front doors was open, and she observed a gun in

3

front of the house. Shortly thereafter, Mrs. Wolfe received a call that her home in Slidell was burglarized. She testified that she called the police, and travelled to her Slidell home. When she arrived, the police were already at her residence. She discovered that while there were no signs of forced entry, her television was missing and her home was in total disarray. During the police investigation of the burglary, the police learned the burglars were described as four black males, three of which had long hair. The witness informed police that two men were seen carrying a television to a black vehicle that was not Mr. Wolfe's truck while the other two men remained in the car.

That night, police spotted a vehicle matching the description of Mr. Wolfe's truck. Upon realizing that he was being followed, the driver, later identified as Defendant, led police on a chase. Gonzales, the passenger, began firing at the police from the passenger window. When the truck eventually came to a stop, Gonzales fled the vehicle and fired additional shots at police. Defendant surrendered while still in the vehicle. At trial, one of the investigating officers recalled the armed robbery/kidnapping at 1704 South Lopez Street as occurring at around 2:00 p.m., and the ultimate capture of Defendant at 11:00 p.m., approximately nine hours later. The same officer also testified that Defendant did not have a firearm on him when he was apprehended and that Defendant tested negative for gunshot residue.

The following morning, Mr. Raskin identified Defendant and Gonzales as his assailants in photographic lineups. The detective who interviewed Mr. Raskin and performed the photographic lineup testified at trial confirming Mr. Raskin's testimony. The detective further stated that Mr. Raskin quickly identified his assailants and indicated that the perpetrator in the red shirt was holding a revolver

4

and the perpetrator in the white shirt had a semiautomatic weapon. The police later discovered Mr. Wolfe's body, with a gunshot wound to the head, outside a residence on South Lopez Street, several houses down from Mr. Wolfe's property. The police recovered, near Mr. Wolfe's body, a single .45 caliber spent cartridge casing that police determined was fired from a semiautomatic handgun. The autopsy report of Mr. Wolfe, the contents of which the parties stipulated to at trial, indicated that Mr. Wolfe suffered four gunshot wounds, shot from close range.

In November 2008, Defendant was charged by bill of indictment with the second degree murder of Roy Wolfe, the armed robbery of Eddie Raskin, and the unauthorized use of a motor vehicle belonging to Roy Wolfe. Also charged in this indictment was Alonzo Gonzales. Gonzales was charged with the same offenses as Defendant, along with six counts of aggravated assault on a police officer with a firearm. In March 2018, the trial commenced against both defendants. The jury deadlocked on the counts charging Defendant with armed robbery and second degree murder; however, he was found guilty of the unauthorized use of the motor vehicle belonging to Mr. Wolfe.

A second trial, solely against Defendant, was held in December 2018, wherein the jury rendered unanimous verdicts, finding Defendant guilty as charged of armed robbery and second degree murder. Defendant subsequently filed a motion for post-verdict judgment of acquittal and motion for new trial, which the trial court denied. In January 2019, the trial court sentenced Defendant, as to his armed robbery conviction, to 25 years in the custody of the Louisiana Department of Corrections with credit for time served. With respect to Defendant's second degree murder conviction, the trial court sentenced him to life without benefit of parole, probation, or suspension of sentence, to run concurrently with his 25-year

sentence for armed robbery. Defendant timely filed the instant appeal.

## *ERRORS PATENT*

A review of the record reveals that the sentence the court imposed in connection with Defendant's armed robbery conviction was illegally lenient. The court imposed a twenty-five-year sentence, but omitted the requirement that the sentence be served "without benefit of parole, probation, or suspension of sentence." La. R.S. 14:64(B). Nevertheless,

> [t]his Court has recognized that "paragraph A of La. R.S. 15:301.1 provides that in instances where the statutory restrictions are not recited at sentencing, they are contained in the sentence, whether or not imposed by the sentencing court." *State v. Wyatt*, 2011–0219, p. 20 (La. App. 4 Cir. 12/22/11), 83 So.3d 131, 143 (citing *State v. Williams*, 2000-1725 (La. 11/28/01), 800 So.2d 790). Accordingly, "this Court need take no action to correct the trial court's failure to specify that the defendant's sentences be served without benefit of parole, probation or suspension of sentence" because it is statutorily effected. *State v. Wyatt*, 2011–0219, p. 20, 83 So.3d at 143 (citing La. R.S. 15:301.1(A)).

*State v. Dominick*, 13-0270, p. 3-4 (La. App. 4 Cir. 1/30/14), 133 So.3d 250, 252. Thus, this Court is not required to take any action as this error is statutorily self-correcting.

## *DISCUSSION*

### *Sufficiency of the Evidence*

At the outset, we address the sufficiency of the evidence to sustain the conviction. "[I]n accordance with the well-settled jurisprudence that '[w]hen issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence.'" *State v. Miner*, 14-0939, p. 5 (La. App. 4 Cir. 3/11/15), 163 So.3d 132, 135 (quoting *State v. Hearold*, 603 So.2d 731, 734 (La. 1992)).

In this case, Defendant presents no arguments supporting his assertion that

6

the evidence was insufficient to support his armed robbery conviction. Instead, Defendant challenges the sufficiency of the evidence supporting his second degree murder conviction.

The standard for review of a claim of insufficiency of the evidence is set forth in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979):

> …the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. (Emphasis in original).

"Under the *Jackson* standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court." *State v. Williams*, 11-0414, p. 18 (La. App. 4 Cir. 2/29/12); 85 So.3d 759, 771. Further, "a factfinder's credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence." *Id.* The existence of conflicting statements as to factual matters affects the weight of the evidence, not its sufficiency, and such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. *State v. Wells,*10-1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 306. "The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction." *Id.*

Under La. R.S. 14:30.1, second degree murder is defined, in pertinent part, as the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of second degree kidnapping, even though he had no intent

7

to kill or to inflict great bodily harm.[1]

"The parties to crimes are classified as: (1) [p]rincipals; and (2) [a]ccessories after the fact." La. R.S. 14:23. The law of principals, as set forth in La. R.S. 14:24, states that: "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."

"[A d]efendant's mere presence at the scene is not enough to 'concern' an individual in the crime." *State v. Hampton*, 98-0331 (La. 4/23/99), 750 So.2d 867, 880 (citing *State v. Schwander*, 345 So.2d 1173, 1174-75 (La. 1977)). A jury's inference that a defendant aided and abetted in a crime cannot be founded upon mere speculation based upon guilt by association. *Schwander*, 345 So.2d at 1175. It is those persons "who knowingly participate in the planning or execution of the crime" that are considered principals. *State v. Pierre,* 631 So.2d 427, 428 (La. 1994). "[A]n individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state." *State v. Lewis,* 46,513, p. 5 (La. App. 2 Cir. 9/28/11), 74 So.3d 254, 257. Acting in concert, each person becomes responsible not only for his own acts, but also for the acts of the other. *State v. Anderson,* 97-1301 (La. 2/6/98), 707 So.2d 1223, 1224. Under the law of principals, a defendant may be convicted of an offense even if he did not personally fire the fatal shot. *Hampton, supra*; *Lewis, supra.*

Defendant, in support of his claim that there was insufficient evidence to

---

[1] As reflected by the court's instructions, the State charged Defendant under the felony murder doctrine. Under La. R.S. 14:44.1, second degree kidnapping is defined, in pertinent part, as the imprisoning or forceful secreting of a person when the offender is armed with a dangerous weapon.

8

support his second degree murder conviction, relies upon non-dispositive evidence. He states that upon his apprehension while driving Mr. Wolfe's truck, he was not in possession of a firearm and a gunshot residue test was negative. This evidence was not crucial. As testimony pointed out, nine hours elapsed between the time of the crimes and the time Defendant was apprehended. Defendant had ample time to discard his revolver and ample time to bathe, thereby neutralizing the effectiveness of the gunshot residue test.

Defendant also points to the absence of his fingerprints on the blue car Mr. Raskin saw in the area and on the firearm recovered from the crime scene. Defendant suggests that a third person, allegedly seen in the blue car and seen in Mr. Wolfe's Silverado, may have been responsible for the murder.

A review of Mr. Raskin's testimony reflects that at no point did Mr. Raskin identify a third person at the crime scene. He saw three men in a blue car driving around the scene, but only two men, Defendant and Gonzales, holding him hostage at gunpoint, secreting Mr. Wolfe away, and later, firing at Mr. Wolfe. Likewise, there was no evidence that a third person was apprehended in Mr. Wolfe's truck. Only Defendant and Gonzales were identified by Mr. Raskin, and only Defendant and Gonzales were apprehended in Mr. Wolfe's truck.[2] That Defendant did not leave fingerprints on a blue car described as being in the area of the incident, does not establish reasonable doubt that he was not at the scene of the crime as attested to by Mr. Raskin. Further, the recovered firearm was proven not to be one of the murder weapons, so one would not expect either of the two perpetrators' prints to be on the weapon.

---

[2] An officer reported that a third person may have been in the Silverado truck, but a third suspect was never apprehended.

9

Defendant also notes that there was no "scientific evidence" placing him at the crime scene, 1704 South Lopez Street. While there was no scientific evidence placing him at the scene, there was eyewitness testimony placing him there. Mr. Raskin positively identified Defendant as one of the assailants who robbed him at gunpoint at 1704 South Lopez Street. As noted earlier, "[t]he testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction." *Wells,* 10-1338, p. 5, 64 So.3d at 306.

Further, the absence of evidence that Defendant was not specifically identified as one of the persons who later burglarized the Wolfes' home, is also not crucial to the murder of Mr. Wolfe in this case; nor is it significant that there was no proof that "Defendant himself killed Roy Wolfe."

Mr. Raskin positively identified Defendant as one of his assailants. Mr. Raskin stated that he was confident in his identification of Defendant because he spent at least 30 minutes with Defendant being held hostage at gunpoint in a small bathroom. Additionally, Mr. Raskin stated that while Gonzales secreted Mr. Wolfe away, thereby establishing the necessary element to support a finding of second degree kidnapping, Defendant sprang into action, firing his revolver at Mr. Wolfe as he fled. Mr. Wolfe's body was found just a few houses down from where the shooting commenced. That there was no direct proof that Defendant shot the bullets that killed Mr. Wolfe does not exculpate Defendant under the law of principals. Based on Mr. Raskin's testimony, a reasonable juror could conclude that Defendant acted in concert with Gonzales in robbing Mr. Raskin at gunpoint, secreting Mr. Wolfe away, then ultimately opening fire on Mr. Wolfe.

Viewing the evidence, in particular, Mr. Raskin's testimony, in the light most favorable to the prosecution, a rational trier of fact could have found the

victim was killed during the perpetration or attempted perpetration of second degree kidnapping and thus sufficient to prove Defendant guilty of second degree murder. Therefore, we find no merit to this assignment of error.

## *Motions for Mistrial*

Defendant also avers that the trial court's failure to grant a mistrial warrants reversal of his sentences and convictions. La. C.Cr.P. art. 775 provides that the trial court shall grant a mistrial "when prejudicial conduct in or outside of the courtroom makes it impossible for the defendant to obtain a fair trial." "Mistrial is an extreme remedy and, except for instances in which the mandatory mistrial provisions of La. C.Cr.P. art. 770 are applicable, should only be used when substantial prejudice to the defendant is shown." *State v. Castleberry*, 98-1388, p. 22 (La. 4/13/99), 758 So.2d 749, 768. "The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion." *State v. Wessinger*, 98-1234, p. 24 (La. 5/28/99), 736 So.2d 162, 183.

Defendant twice moved for a mistrial during Detective Orlando Matthews' ("Detective Matthews") testimony.[3] Specifically, during cross-examination, Detective Matthews was questioned as to why the gun the police recovered was not tested earlier to determine if it was used in the murder of Mr. Wolfe. The following exchange between Detective Matthews and defense counsel took place:

---

[3] In July of 2008, Detective Matthews was assigned to New Orleans Police Department's homicide section and became involved in the investigation associated with the death of Mr. Wolfe. He explained at trial that it was not until Mr. Wolfe's body was discovered and it became a homicide investigation that he was assigned to the case. He had no involvement in the investigation of either the armed robbery or the Slidell burglary, and he did not participate in the chase which led to the apprehension of Defendant and Gonzales.

A. The reason I didn't have to find out whether it was the murder weapon was because I had an interview with [defendant], who confessed to the entire incident and stated Gonzales was there.

MR. EHLE [Defense Counsel]: Objection, Your Honor, that is - -

THE WITNESS [Detective Matthews]: I didn't have to go further with my investigation. He had already gave [sic] me an interview.

BY MR. EHLE:
Q. You're saying [defendant]?

A. Mr. Gonzales, correct, Mr. Gonzales gave me a full interview.

MR. EHLE: Your Honor, objection, may we approach?

A bench conference was held, and defense counsel moved for a mistrial, which the trial court denied. After the bench conference, the following colloquy ensued:

BY MR. EHLE:

Q. Detective Matthews, [defendant] did not confess to anything in this case?

A. Alonzo Gonzales did.

Q. That is not my question. I don't care what Alonzo Gonzales did. Isn't it a fact that [defendant] never confessed to you about anything in this case?

A. [Defendant] refused to talk to me.

Subsequent to this exchange, defense counsel again sought a mistrial, which the trial court denied. The trial court then called for a ten-minute recess. When the recess ended, defense counsel moved to strike Detective Matthews' testimony regarding any statements provided to him during his investigation. The trial court granted defense counsel's motion.

Defendant's argument that the trial court erred when it failed to grant a

12

mistrial is three-fold. We address each argument separately and in the order in which they are set forth in Defendant's appellate brief. First, Defendant avers the trial court should have granted a mistrial based upon Detective Matthews' testimony that Defendant refused to speak to him. Defendant contends that the statement was an impermissible reference to his right, under *Miranda*, to remain silent and, as such, violates the Supreme Court's holding in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

In *Doyle*, the United States Supreme Court held that "the use for impeachment purposes of a [defendant's] silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.*, 426 U.S. at 619, 96 S.Ct. at 2245. In *State v. Smith*, 336 So.2d 867, 868 (La. 1976), the Louisiana Supreme Court pointed out that La. C.Cr.P. art. 770 does not apply to statements referring to a defendant's post-arrest silence by the prosecutor or by witnesses, but only applies to references to the defendant's failure to testify at trial.

La. C.Cr.P. art. 771 is the applicable provision concerning the proper remedy where references are made to a defendant's post-arrest silence. Pursuant to La. C.Cr.P. art. 771, the trial court has the discretion to grant a mistrial or simply admonish the jury, upon the request of the defendant, where the prosecutor or a witness makes a reference to a defendant's post-arrest silence. However, a brief reference to a defendant's post-arrest silence does not mandate a mistrial or reversal when the trial as a whole was fairly conducted; the proof of guilt is strong; and the prosecution made no use of the silence for impeachment purposes. *State v. Valentine,* 05-0233, p. 12-13 (La. App. 4 Cir. 4/5/06), 929 So.2d 779, 787 (citing *State v. Ledesma*, 01-1314 (La. App. 5 Cir. 4/30/02), 817 So.2d 390).

13

In this case, Detective Matthews' reference to Defendant's failure to speak to him is not indicative of any intent on the part of the State to ascribe a guilty meaning to Defendant's silence or to undermine an exculpatory version of events offered by Defendant. First, and most importantly, the comment was not elicited by the prosecution, but rather, was given in response to defense counsel's cross-examination of Detective Matthews regarding the extent of his investigation. Additionally, no further reference was made, either during trial or closing arguments, to Defendant's lack of cooperation in the investigation of Mr. Wolfe's murder. Thus, Detective Matthews' comment that Defendant remained silent did not undermine his defense and did not run afoul of his right to due process as guaranteed under the Fourteenth Amendment.

Second, Defendant avers the trial court should have granted a mistrial based upon Detective Matthews' testimony that Defendant confessed to the crimes at issue. According to Defendant, this false testimony runs counter to the dictates set forth in *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

> To prove a *Napue* claim, the accused must show that the prosecutor acted in collusion with the witness to facilitate false testimony. When a prosecutor allows a state witness to give false testimony without correction, a conviction gained as a result of that perjured testimony must be reversed, if the witness's testimony reasonably could have affected the jury's verdict, even though the testimony may be relevant only to the credibility of the witness. *Id.* at 269, 79 S.Ct. 1173. Furthermore, fundamental fairness to an accused, i.e., due process, is offended "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

*State v. Broadway*, 96-2659, p. 17 (La. 10/19/99), 753 So. 2d 801, 814.

*Napue* is inapplicable in this case because Detective Matthews' false

14

testimony did not go uncorrected. Almost immediately, Detective Matthews corrected himself, informing jurors that Defendant did not confess. Further, the trial court granted Defendant's motion to strike "Detective Matthews' testimony concerning any statements in this case." Therefore, we find no *Napue* violation exists in this case. The false testimony was not only corrected, but also stricken.

Finally, Defendant asserts that if one considers both of Detective Matthews' statements, that Defendant confessed to the crimes and that Defendant refused to speak to Detective Matthews, in conjunction with each other, the trial court erred in refusing to grant a mistrial. However, the trial transcript reflects that Defendant never moved for a mistrial based upon the cumulative effect of Detective Matthews' statements. His first motion for a mistrial was based on Detective Matthews' false statement that Defendant had confessed to the crime. The second was based on Detective Matthews' statement that Defendant had refused to speak to him. No third motion for a mistrial was raised. Pursuant to La. C.Cr.P. art. 841(A), this Court will not consider an assignment of error raised for the first time on appeal. *State v. Hill*, 2016-0123, p. 10 (La. App. 4 Cir. 6/1/16), 194 So. 3d 1262, 1268.

Moreover, even assuming that the trial court erred in denying Defendant's motions for mistrial, such error was harmless. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The inquiry is not whether, in a trial that occurred without the errors, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the errors. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); *State v. McQuarter*, 2000-1553 (La. App. 4 Cir. 6/6/01), 788 So.2d 1266. The record indicates that the trial as a whole was conducted fairly.

15

Proof of defendant's guilt was strong. Mr. Raskin positively identified Defendant at trial and in a six-person photographic lineup. Mr. Raskin not only identified Defendant as the person who robbed him at gunpoint, but also testified that Defendant, in concert with Gonzales, secreted Mr. Wolfe away and then, when Mr. Wolfe became aware of the ambush, fired shots at him. The unanimous verdicts were not attributable to any error in the admission of Detective Matthews' statement that Defendant refused to speak to him. Nor were the verdicts attributable to Detective Matthews' statement that Defendant confessed, a misstatement that not only was corrected, but also was stricken.

The trial court did not abuse its discretion in denying the motions for mistrial. This assignment is without merit.

## *DECREE*

Based on the foregoing, we find the evidence sufficient to support the jury's guilty verdicts on the charged offenses. Likewise, the investigating detective's testimony at trial, which was not only corrected but also stricken, did not attribute to the guilty verdicts in this case. Therefore, the trial court did not abuse its discretion in denying Defendant's requests for a mistrial. Accordingly, we affirm Defendant's convictions and sentences.

**AFFIRMED**