LOLLEY, J.
 

 | jThis criminal appeal arises from the Third Judicial District Court, Parish of Lincoln, State of Louisiana. A jury found James C. Lewis guilty of second degree murder, a violation of La. R.S. 14:30.1. Thereafter, Lewis was sentenced to the mandatory term of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. For the following reasons, Lewis’s conviction and sentence are affirmed.
 

 Facts
 

 On September 1, 2007, two young boys were en route to a fishing excursion when one of the boys saw what he thought was a body in the brush on the side of a road, less than one mile from the Louisiana state line, near Junction City, Arkansas. The next day, one of the boys told his father of their discovery, and the father went back to the area in an attempt to locate the body; however, he was unable to see it from the main road. After his son insisted that the body was there, the father went back and was able to see the body in the thick brush. He notified a Junction City police officer, and Precious “Petey” Story’s body was recovered. At the trial of James Lewis, the coroner would testify that the cause of her death was multiple gunshot wounds to the head and neck.
 

 Lewis, who had been detained after a traffic violation in a Delta 88 bearing Pe-tey’s license plate, eventually made a statement to detectives alleging that his brother, Jamie Jackson, was responsible for shooting Petey. Lewis told police that he was afraid of his brother, and as a result he complied with his demands and did not attempt to help Petey after she was shot inside the house where he had been staying.
 

 12Lewis, his brother Jamie Jackson, and Roger Phillips were eventually arrested for charges related to the murder of Petey. Lewis was indicted for second degree murder. A motion for change of venue was granted and the trial was moved from Union Parish to Lincoln Parish. Following a jury trial, the jury returned a verdict of guilty as charged. Thereafter, Lewis was sentenced to the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This appeal ensued.
 

 Applicable Law
 

 On appeal, Lewis raises the issue of sufficiency of the evidence for his conviction both
 
 pro se
 
 and with appeal counsel. In the appeal brief filed by his attorney, he argues specifically that the state failed to establish his responsibility for Petey’s death. Additionally, Lewis maintains that the state failed to establish that he had specific intent to kill the victim or that he actively desired her death.
 
 Pro se,
 
 Lewis contends that the state’s case against him consisted of only circumstantial evidence that he killed the victim for “the purpose of some form of a theft,” and that the verdict in this case was a “verdict of emo
 
 *256
 
 tion,” unsupported by sufficient evidence. He further argues that the state failed to prove beyond a reasonable doubt that he shot the victim; therefore, the only issue to resolve was whether or not he was a principal to the murder. Finally, Lewis also claims that the circumstantial evidence presented by the state does not rise to the level of excluding every reasonable hypothesis of innocence. We disagree.
 

 13As stated in La. R.S. 14:30.1, in pertinent part:
 

 A. Second degree murder is the killing of a human being:
 

 (1) When the offender has a specific intent to kill or to inflict great bodily harm.
 

 (2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.
 

 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 2001-1658 (La.05/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.02/22/06), 922 So.2d 517. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness.
 
 State v. Casey,
 
 99-0023 (La.01/26/00), 775 So.2d 1022,
 
 cert. denied,
 
 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). The reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law.
 
 Id.
 

 |4The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Eason,
 
 43,788 (La.App.2d Cir.02/25/09), 3 So.3d 685,
 
 writ denied,
 
 2009-0725 (La.12/11/09), 23 So.3d 913.
 

 The
 
 Jackson
 
 standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence, must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that a defendant was guilty of every essential element of the crime.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983);
 
 State v. Speed,
 
 43,786 (La. App.2d Cir.01/14/09), 2 So.3d 582,
 
 unit denied,
 
 2009-0372 (11/06/09), 21 So.3d 299.
 

 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion.
 
 State v.
 
 
 *257
 

 Gullette,
 
 43,082 (La.App.2d Cir.02/13/08), 975 So.2d 753.
 

 A person may be convicted of an offense even if he has not personally fired the fatal shot.
 
 State v. Hampton,
 
 98-0331 (La.04/23/99) 750 So.2d 867,
 
 cert. denied,
 
 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390, (1999). 1/¡Regarding the law of principals, La. R.S. 14:24 provides:
 

 All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
 

 Only those persons who knowingly participate in the planning or execution of a crime are principals. Mere presence at the scene is therefore not enough to “concern” an individual in the crime. Moreover, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state.
 
 State v. Pierre,
 
 631 So.2d 427 (La.1994). All persons concerned in the commission of an offense, either directly or indirectly, are principals in the crime and culpable according to the mental state they possess at the time of the offense. It is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice’s intention.
 
 State v. Anderson,
 
 97-1301 (La.02/06/98), 707 So.2d 1223.
 

 Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant.
 
 State v. Graham,
 
 420 So.2d 1126 (La.1982);
 
 State v. Taylor,
 
 621 So.2d 141 (La.App.2d Cir.1993),
 
 writ denied,
 
 93-2054 (La.02/11/94), 634 So.2d 371. Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1);
 
 State v. Lindsey,
 
 543 So.2d 886 (La.1989),
 
 cert. denied,
 
 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990);
 
 State v. McCray,
 
 621 So.2d 94 (La.App.2d Cir.1993). The determination of whether the requisite intent is present in a criminal case is for the trier of fact.
 
 State v. Brown,
 
 618 So.2d 629 (La.App.2d Cir.1993),
 
 writ denied,
 
 624 So.2d 1222 (La.1993).
 

 Discussion
 

 As stated, on appeal Lewis challenges the sufficiency of the evidence used to convict him. The trial of James Lewis included physical evidence as well as the testimony of many witnesses to support his conviction.
 

 Sondra Strahan
 

 At the trial of the matter, Sondra Stra-han testified that she and her husband raised Petey from the time she was 22 months old until her death at the age of 18.
 
 [1]
 
 Sondra testified that Petey worked at the IGA grocery store and drove a turquoise 4-door Grand Am. Strahan identified the state’s exhibits of photos of Pe-tey’s vehicle without its license plate and without the center console compact disc player. Sondra stated that the vehicle was recovered with the keys in the ignition and released to her by the sheriffs office. Pe-tey’s pit bull puppy, Chavez, was also recovered after her disappearance.
 

 
 *258
 
 Sondra explained that she last saw Pe-tey on Thursday, August 30, 2007, when Petey came home after work sometime near 7:00 p.m. She described that Petey changed her clothes and asked to be awakened the next morning at 6:00 a.m., because she had to report to work at 7:00 a.m. 17According to Sondra, Petey left the house, carrying her dog, wearing a “Big Dog” T-shirt, khaki stretch pants, and blue Skechers tennis shoes. The next morning, on August 31, Strahan went to wake Petey, but she was not in her room. Petey was reported missing that Friday morning.
 

 Jorman Snowden
 

 Jorman Snowden, an assistant manager at the IGA, testified that he was on duty on August 30, 2007, the last time Petey worked at the store where she was a cashier. Petey worked that day from 2:00 to 7:00 p.m., and she received and cashed her weekly paycheck that day. Snowden recalled observing Lewis visiting Petey at the store on different occasions for several weeks prior to her disappearance. On August 30, during the course of Petey’s shift, Snowden saw Lewis come into the store and talk with her; in fact, images of Lewis entering and leaving the store around 5:25 p.m. were captured by the store’s video surveillance system. Still images of the video were entered into evidence. Lewis returned to the store later that evening around 7:00 p.m. Shortly thereafter, the victim ended her work shift and Snowden watched her as she got into her vehicle in the store parking lot. As Petey was driving away, Snowden saw her stop and pick up the defendant and his brother.
 

 Jarkel Brown
 

 Fifteen-year-old Jarkel Brown of Junction City, Arkansas, testified he and a friend, Robert Armstrong, were planning to go fishing on his grandfather’s property on September 1, 2007. As they were walking along a trail on that day, Jarkel saw a body in some bushes on the side of the trail. 1 sJarkeI told Robert about the body and the boys ran off, not telling anyone that day of their discovery because they were scared. The next day, Jarkel, his brother Jaron Brown, and Robert saw the body in the same place. The boys did not touch the body or go near it. Robert would later tell his father about the body.
 

 Quentin Can’oll
 

 Quentin Carroll, a resident of Junction City, Arkansas, testified that he was the father of Robert Armstrong. According to Carroll, Robert had been acting strangely, and as a result of a conversation with Robert, Carroll went out to the area near State Line Road on September 2, 2007. Initially, he did not see anything unusual, and he made three trips to the area before seeing a white blanket in the high weeds. After seeing this, Carroll made contact with Lloyd Falcon, a deputy police officer in Junction City, to report what his son had told him and what he had seen. Carroll testified that Officer Falcon was able to see the body from the vantage point of a side road.
 

 Juan M. Reyes, Jr.
 

 Juan M. Reyes, Jr., was accepted by the trial court as an expert in the field of crime scene investigations. Reyes stated his current assignment was as an instructor with the Arkansas Law Enforcement Training Academy. Reyes testified he was working as a senior investigator on September 2, 2007, when he was called out to investigate the discovery of a body, later identified as Petey, a few miles from the Louisiana state line in Union County, Arkansas, approximately 0.8 miles from the city limits of Junction |3City on East State Line Road. When Reyes arrived, other law enforcement officers were on the scene; however, none of them had approached the actual area where the body was located. Reyes found the body of a
 
 *259
 
 white female lying in the wild-growing weeds approximately four feet away from a gravel drive. There was no evidence that anyone had walked in the area near the body. Tire prints were found on the gravel driveway.
 

 Reyes opined that Petey’s body had been tossed from the gravel driveway. The foliage near the driveway did not appear disturbed, and it prevented the body from being seen from the highway. There was no evidence that the body had been dragged through the gravel or surrounding grassy area. Petey’s arms were straight up over her head and her legs were bent at the knees with her feet nearly together forming “a diamond shape.” A bed ruffle was covering the victim’s upper body and a “Big Dog” T-shirt and bra were pulled up over her breasts. The lower portion of the victim’s body was nude with the exception of socks. Her underwear was found near her left arm. Reyes believed the bed ruffle and Petey’s underwear had been thrown over the body.
 

 While the body had started decomposing and was covered with small insects including maggots, Reyes did not see any evidence that any larger animals had moved or fed on the body. Reyes was unsure how long Petey’s body had been in the area where it was found. He did not believe she had been killed in the location where she was found, and the lack of blood spatter or pooling was indicative of this fact. As the body was removed, the victim’s hands were covered with bags for preservation of any potential |inevidence. Reyes observed that Petey’s body had what appeared to be four “bullet wounds” to her head. All of the wounds appeared to be consistent with each other and made by a medium-to-small caliber bullet. Reyes was unable to determine if the wounds were entry or exit wounds.
 

 Officer
 
 William⅛
 
 Todd Gilbert
 

 Officer William Todd Gilbert, the patrol unit commander of the Union Parish Sheriffs Department, testified that he was working in the narcotics division on August 30, 2007, when he was involved in the investigation of Petey’s disappearance.
 
 [2]
 
 Officer Gilbert was responsible for collecting blood evidence at the house located at 217 John Louis Road, Spearsville, Louisiana, where Lewis had been living at the time.
 
 [3]
 
 Officer Gilbert described that he worked the inside of the house while Off. Keith Blackmon collected evidence on the outside of the house. Approximately six bloodstains were found inside the house. Samples were collected from the stains using a standard procedure where a swab moistened with sterile water is used to remove a sample of the evidence. The swab would be allowed to dry before being sealed and forwarded for the appropriate testing.
 

 Officer Eddie Horton
 

 Officer Eddie Horton of the Bernice Police Department testified he was working on August 31, 2007, when he noticed a tan Oldsmobile Delta |n88 with a broken windshield traveling on the streets of Bernice. Officer Horton also noticed that the vehicle had a broken taillight and initially did not have a license plate. He decided he was going to make a traffic stop of the vehicle, but he “lost” the vehicle for a short period of time. As Off. Horton drove around looking for the vehicle, some citizens reported to him that a tan vehicle had run
 
 *260
 
 two stop signs, and Off. Horton continued his search through the area before deciding to stop in front of a local business to wait to see if the vehicle would pass. The vehicle went past Off. Horton, and he noticed that the vehicle now had a license plate, which was the same one for which a “be on the lookout” had been issued.
 

 Officer Horton described that he engaged his emergency overhead lights and attempted to stop the vehicle. At that time, the vehicle pulled away from him and Off. Horton then activated his siren, attempting to stop the vehicle. The driver ran a stop sign before turning onto another street. At that point, the driver of the vehicle slowed the car down, jumped out, and ran toward a wooded area. As the driver ran, he looked back and Off. Horton recognized him as James Lewis. Although Off. Horton knew Lewis by sight, he had no significant interaction with him prior to that day. As Lewis ran away, the passenger (Roger Phillips) brought the vehicle to a complete stop, and Off. Horton removed him from the vehicle and searched him for officer safety. There was a small pit bull puppy on the back floorboard of the vehicle and several open quarts of beer inside.
 

 Officer Horton called for backup officers and waited with the vehicle until they arrived. He left the vehicle for a short period of time when he 112went to an apartment complex where Lewis had been found. According to Off. Horton, Lewis gave the officers another name (“Heard”) and told the officers that he had been asleep in the apartment for at least two hours. However, Off. Horton knew this to be false, because he had witnessed Lewis running from the vehicle and he knew Lewis’s name prior to the attempted traffic stop.
 

 Lavert Norman
 

 Lavert Norman, a resident of Strong, Arkansas, testified that the defendant, whom he knew from middle school, arrived at his house early on the morning of August 31, 2007. According to Norman, Lewis was driving a greenish Grand Am, and Roger Phillips and Jamie Jackson were both with him. Norman described how Lewis asked him if he was interested in selling his vehicle, a Delta 88. Norman testified that he was a bit hesitant about selling the car, because he had recently purchased it and done some repair work on it. The Delta 88 did not have a license plate at that time. Lewis later asked Norman to trade the Delta 88 for Peters car, the Pontiac Grand Am. Norman agreed to the trade, stating that Lewis was the only one of the group involved in negotiating the trade of the vehicles.
 

 According to Norman, while Lewis was negotiating the vehicle trade, he took the Delta 88 for a test drive with Norman riding as a passenger. They drove to Anthony Williams’s home with Phillips and Jackson following them in the Grand Am. Once they arrived at Williams’s home, Lewis attempted to sell speakers that were in the trunk of the Grand Am. Norman testified that he caught a glimpse of a piece of cloth that had some 11sblood on it when the trunk of the vehicle was opened. When Norman asked about it, Lewis responded, “I just killed the mother-f* * *er.” Norman thought the defendant was simply mouthing off.
 

 Norman described how he stayed with the group for about five minutes before he left in the Delta 88 to go home. Lewis later returned and the trade took place. Norman testified that he wrote Lewis a bill of sale and gave him the title to the vehicle, and at trial Norman identified the documents found inside the Delta 88 as the items he transferred to Lewis as a result of the trade. Lewis did not require Norman provide a bill of sale for the Grand Am. Norman said Lewis removed the li
 
 *261
 
 cense plate from the Grand Am and attached it to the Delta 88 with a piece of speaker wiring. The puppy was also was transferred to the Delta 88.
 

 Anthony Williams
 

 Anthony Williams testified that he was living in Strong, Arkansas, on August 31, 2007, when Lewis arrived at his home at 9:00 a.m. driving Norman’s car, a Delta 88. Williams stated that he knew Lewis from school, but he had not seen him in years. According to Williams, another vehicle arrived, which Williams identified as a green Grand Am. As recalled by Williams, Jackson, who Williams knew as Lewis’s brother, was driving the Grand Am. Williams said he and the others, including Phillips, Norman, and “Rashad,” looked into the trunk of the Grand Am when Lewis indicated he had some speakers to sell. As related by Williams, all those individuals gathered around the trunk were engaged in several conversations simultaneously. When Lewis moved one of the speakers, Williams saw |14what he believed to be blood drop from the speaker or from a piece of cloth that was in the vehicle. Williams testified that Rashad purchased some of the speakers, planning to resell them. Lewis was the one who negotiated the sale of the speakers, and his brother, Jackson, stood by while the negotiations and transaction took place. Williams testified that he did not hear Lewis make any statements about killing anyone; however, once he saw the blood in the vehicle, he moved away from the car, leaving Lewis, Rashad and Norman there talking.
 

 Roger Phillips
 

 Roger Phillips, a resident of Strong, Arkansas, testified that the brothers, Lewis and Jackson, arrived at his home sometime in the early morning hours between 3:00 a.m. and 4:00 a.m. on August 31, 2007. Lewis told Phillips that he had just come from out of town and stopped to see Phillips because they had not seen each other in some time. According to Phillips, he knew Lewis from school and they “talked” and would hang out sometimes. Phillips stated that Lewis arrived driving a green Grand Am. Phillips asked Lewis to take him to the store to purchase cigarettes. Lewis, Jackson and Phillips went to the store in the vehicle with the pit bull riding in the back seat. Phillips testified that Lewis told him that the vehicle was his, which Phillips believed because Lewis had the keys to the vehicle.
 

 Phillips described that the group returned from the store and sat at Phillips’s home listening to music. Sometime after daylight, they all left in the Grand Am and went cruising. Phillips recalled that they eventually got some alcohol to drink, and he drank to his limit, but was still able to speak |15and remember things that happened. The group continued their ride around the town and stopped at Norman’s house which was nearby, because they saw his Delta 88. The defendant and Norman had a conversation about the Delta 88. Lewis took the Delta 88 for a test drive with Norman. Phillips and Jackson got in the Grand Am with Jackson driving. At some point during the test drive, Phillips testified, Lewis stopped and attempted to sell the speakers out of the trunk of the Grand Am.
 

 Later, when Phillips saw Norman in the Grand Am, Phillips believed that “they had done made some kind of deal.” Lewis asked Phillips to ride with him to get the title to the Grand Am on a “turnaround trip.” On their way to Bernice, Lewis was driving with Jackson in the front passenger seat. Phillips rode in the back of the vehicle with the dog. When they arrived in Bernice, they stopped for gas and Jackson was dropped off at some point. Approximately 20 minutes later, while “making a few blocks,” they saw a police ear,
 
 *262
 
 and Lewis drove around another vehicle and through a stop sign. Phillips testified that the police chased them; at this point Lewis stopped and put the license plate on the vehicle. According to Phillips, the police pulled them over, and Lewis ran from the vehicle, but Phillips stayed. The dog was still in the back seat of the vehicle when they were stopped; however, before they were stopped, Lewis told Phillips to throw the dog out of the car, saying that “she” got it for him. Phillips related that Lewis told him that “they” were saying he was the last one seen with “her” so he wanted to get rid of the dog. Further, Lewis told Phillips that “they” were saying the girl had been kidnapped and he had something to do with it.
 

 |
 
 ifiShonwalkia Hall
 

 Shonwalkia Hall testified she was in her friends Timothy Heard’s apartment when the defendant came in around 5:30 p.m. on August 31, 2007. Hall noticed that Lewis was a bit sweaty and acting nervously and fidgety, although Hall did not deem this behavior unusual. Hall heard Lewis ask Heard for a shirt and then ask if he could lie down in the bedroom. The defendant changed his shirt and lay down. Hall testified that approximately 30 minutes after the defendant arrived at the apartment, the police knocked on the door. Hall heard the police officers walk to the bedroom of the apartment and heard someone saying “wake up, wake up” before they walked back to the living room. Hall heard the defendant as he gave officers a fake name, and she related that shortly thereafter, Lewis was taken from the apartment. She recounted that the officers returned, asking if the defendant had changed his shirt in the apartment. Hall gave the officers the shirt Lewis was wearing when he arrived at the apartment earlier that day.
 

 Sean Ramsey
 

 Sean Ramsey, Lewis’s cousin, testified he was living in a house located near the house at 217 John Lewis Road where Lewis was living. Ramsey testified that he would see Lewis and/or Jackson at the house on different occasions. According to Ramsey, Lewis had visited Ramsey’s home on different occasions and Petey had been to the house at least twice prior to her death.
 

 117On August 30, Ramsey saw Petey at the store where she worked in Bernice. Petey told Ramsey that Lewis had been in his house and had taken some items. Ramsey then noticed that Lewis was wearing one of his shirts. Ramsey went to his home and found items were missing. The items included clothing, a Jamaican cane, videotapes, a hot plate, .22 caliber Federal brand bullets, and an old single-bolt action .22 rifle. Ramsey went from his house to the house on John Lewis Road and looked around for his belongings. Ramsey found his clothes, his hot plate, the Jamaican cane, the videotapes, and the box of bullets. Some of the bullets were missing from the box. Ramsey did not find the rifle in the house, and he never recovered it.
 

 Captain Barry Teague
 

 Captain Barry Teague of the West Monroe Police Department testified that he worked as a trainer with the police department and was responsible for teaching officers techniques to move a person who was unconscious or deceased. Captain Teague stated that it was sometimes difficult to move a deceased or unconscious person because of the uneven distribution of the weight. Captain Teague noted that a “dummy” was generally used during training exercises to demonstrate the techniques for moving a person, and he brought a “dummy” to court to aid in a demonstration of how difficult it would be
 
 *263
 
 for an individual to move a body of the approximate height and weight of the victim. Captain Teague noted that it would be difficult for an individual, acting alone, to move a body of the victim’s size and stature from the trunk of a vehicle, although the taskjjgwould not be impossible. The jurors were given an opportunity to lift the “dummy” during Cpt. Teague’s demonstration.
 

 Officer Keith Blackmon
 

 Officer Keith Blackmon, an investigator with the Union Parish Sheriffs Office, testified that his initial involvement in the investigation of Petey’s disappearance was with the stop of the Delta 88 by Off. Horton. Officer Blackmon went to the scene where the vehicle had been stopped and stayed with the vehicle until it was relocated to the Union Parish Sheriffs Office storage yard. A search warrant was secured, and the vehicle was searched by Off. Blackmon and another officer, Todd Gilbert. They split the duties involved in searching the vehicle, with Off. Blackmon photographing the vehicle, obtaining some evidence from the vehicle, and processing items for latent prints. The license plate from Petey’s car that was attached to the Delta 88 was processed for latent prints by Off. Gilbert. Officer Blackmon took possession of some evidence removed from the Delta 88 by Off. Horton, including a handwritten bill of sale and other paperwork. Officer Gilbert also lifted several latent prints from the vehicle.
 

 Officer Blackmon was later notified that Petey’s vehicle had been located in Arkansas. It was transported to the storage yard, at which time Off. Blackmon obtained a search warrant for the vehicle and conducted a search of it. A woman’s Skechers tennis shoe was found in the trunk of the vehicle. Blood was also found in the trunk. A swab sample was collected, as well as a piece of carpet from the trunk. Several drops of blood were also found on the vehicle, and swab samples were collected. One was from 119under the trunk lid. Another was found on the rear bumper, passenger side. Blood was also found on the lower side bumpers on both sides of the vehicle, as well as on the plastic molding (shoe plate) of the front passenger door. A strand of long light-colored hair was found under the trunk lid over the passenger side of the vehicle. All of this evidence was collected before Pe-tey’s body had been found.
 

 Officer Blackmon further testified that following the search of the vehicles and the discovery of the evidence, foul play was suspected. Because Lewis had been in the Delta 88 and had Petey’s license plate, Off. Blackmon explained that a search warrant was obtained for the home at 217 John Lewis Road, and it was executed at approximately 8:00 a.m. on September 1. Officer Blackmon served as the supervisor of the crime scene unit during the time of the investigation. In the front yard of the house, a Skechers tennis shoe was located matching the one previously found in the truck of Petey’s vehicle. One spent .22 shell casing was found. Officer Blackmon noted that numerous blood samples were taken from the home and were tested; however, not all tested positive for blood or were able to be identified.
 

 Sasha Story
 

 Sasha Story, Petey’s older biological sister, also testified. According to Sasha, the victim was dating someone named Jamar-cus Underwood, and she was not dating Lewis. The last time Sasha spoke with Petey was about 10:00 p.m. on August 30. Sasha said she heard three other voices in the background when she spoke to Petey, and she recognized one of the voices |?,nto be Lewis, whom she knew from school and identified in court. Sasha believed Petey met Lewis about a month and a half before
 
 *264
 
 her disappearance. Petey would generally see the defendant when he called and wanted a ride. Sasha was not aware of her sister hanging out with Lewis prior to her death, nor was she aware that Petey had given Lewis any money during their friendship. In fact, Sasha believed that the victim only visited the defendant at his home on the night she disappeared, although Petey told Sasha that she would be staying the night with Lewis.
 

 Dr. Frank Peretti
 

 Dr. Frank Peretti, a forensic pathologist with the Arkansas State Crime Laboratory, testified as an expert in the field of forensic pathology. Dr. Peretti performed the autopsy on the victim. He related that when Petey’s body was received, it was maggot-infested and decomposing, and it was clad in a short-sleeved shirt and bra that were intertwined and pulled over her breasts, and “clean-appearing” socks. He described that clenched in Petey’s left hand was a piece of white fabric. He further noted that Petey had sustained four gunshot wounds to her head and neck area, including wounds to: the right side of her neck; her forehead between her eyes; a spot adjacent to her left eyebrow; and, the left side of her neck. There were no exit wounds and all of the bullets were found in Petey’s head. Because of the massive maggot infestation and decomposi-tional changes, Dr. Peretti was unable to determine the parameters of the wounds. As described by Dr. Peretti, the bullet that caused the wound to the middle of her forehead traveled into the brain; another bullet traveled into Petey’s left maxillary hi sinus through the cheekbone; and, still another wound to the left side of the neck was caused by a bullet traveling through the neck that lodged in the tongue. Dr. Peretti opined that the wound to the right side of the neck would not have caused instantaneous death and it was possible that Petey would have been able to walk after that injury alone. Each of the other wounds would have caused almost instantaneous death, or at the very least, very rapid death without medical intervention. Other injuries to the body included those associated with insect activity and a laceration to the back of Petey’s right hand. Additionally, Dr. Peretti noted a scrape to Petey’s left thigh.
 

 During the autopsy, Dr. Peretti recovered evidence which he forwarded to the sheriffs department, including: fabric from Petey’s left hand; bullets and bullet fragments; fingernail cuttings and scrapings; scalp hair; oral, anal, and vaginal smears and slides; the blood for DNA; and, the clothing the victim was wearing. While Dr. Peretti completed a sexual assault kit on Petey, he could not see any signs of trauma to her body because of the massive maggot infestation. No semen or spermatozoa was detected in any of the swabs, and toxicology studies did not reveal any drugs in her system (although a small amount of alcohol was detected, it was related to the decomposition of the body). Finally, Dr. Peretti opined that the cause of Petey’s death was multiple gunshot wounds.
 

 Edward Vollman
 

 Edward Vollman, a forensic serologist (a person who examines physical evidence for the presence of body fluids, such a blood or semen), |?¿with the State Crime Laboratory of Arkansas was qualified by the trial court as an expert in his field. The blood swabs submitted for testing in connection with the case, presumptively testing positive for blood, were forwarded for further testing. Vollman confirmed the testimony of the detectives that not all samples collected for analysis tested positive for blood. He acknowledged that the testing of the swabs and items submitted provided varying results. Blood was found on the
 
 *265
 
 swabs from Petey’s car and the floor of the house on John Lewis Road. Blood was found on the socks belonging to Roger Phillips, but not on any of his other clothing items submitted for testing. No blood was found on any of Lewis’s items submitted for testing. Blood was found on Jamie Jackson’s shorts, blue jean shorts, and his underwear. Blood was also found on Jamie Jackson’s belt. Semen was found on a mattress pad and the blanket that covered Petey’s body when she was found. Blood was also found on khaki pants and a red pair of underwear found in the John Lewis Road residence.
 

 Don McClanahan
 

 Deputy Don McClanahan, a retired chief deputy of the Union Parish Sheriffs Office, testified that he assisted in the investigation of Petey’s disappearance. Deputy McClanahan conducted two recorded interviews with Lewis, on September 5 and 6. According to Dep. McClanahan, however, a few days prior to the recorded statements being given, Lewis was also interviewed and asked about Petey’s disappearance. At that time Lewis indicated that he knew Petey, but he did not have any idea where she was. Deputy McClanahan noted that prior to the beginning of the recorded | ^interviews, Lewis was advised of his
 
 Miranda
 
 rights and signed a waiver or explanation of rights. According to Dep. McClanahan, during the recorded interview, Lewis repeatedly claimed that he and Petey were using drugs on the night of her disappearance. Lewis informed Dep. McClanahan that his brother Jackson shot Petey because she owed him $150.00 for drugs. Deputy McClanahan testified that Lewis informed him that Jackson took Petey in her vehicle to get money to pay the debt, but when Jackson returned, Pe-tey was not with him. Lewis told Dep. McClanahan that he and Jackson smoked two “blunts” before leaving the house.
 

 During Lewis’s interview, Dep. McCla-nahan also discussed with him a telephone voicemail message to Jamario Lewis, the defendant’s other brother. The call was made to Jamario’s phone at 12:08 a.m. on August 31. Lewis indicated to McClana-han that the voice on the recording was Jackson’s.
 

 Jamario Lewis
 

 Jamario Lewis, the defendant’s other brother, testified that he received a voice-mail message on August 31. He gave the cell phone to Detective Halley after “[t]hey kept harrassing me” about his cell phone number being the last one called from Petey’s cell phone. Jamario would later listen to the recording with detectives and then with Shawn Alford of the district attorney’s office. Jamario was asked to identify the voices on the recording, but he indicated that it was the job of the police to figure out who was on the recording. Again, after “they harassed me so much,” | g/l Jamario told the investigators what he heard on the recording and that he believed the voices belonged to his two brothers, Lewis and Jackson.
 

 The recording (State Exhibit 74) was played in open court and Jamario testified that he heard Jackson’s voice as the primary person talking and Lewis’s voice in the background. Jamario testified that he did not remember telling anyone anything different prior to the trial. While the recording was played in open court, Jamario provided the following as what was being said:
 

 Damn, dog. Sh* *, you heard me. Now doing this, boy dog. You know what I’m saying? I be on sh* * today. I’m a merk-ass n* * * * * dog. Quit playing dog. You know what I’m saying? Straight mother f* * * * * gangsta dog. You know what I’m talking about? Remember, I told you I had to have it. Got that rifle back there. Throwaway.
 
 *266
 
 Might be f* ⅜ *ing up. I can get a dub off of this one.
 

 At trial, Jamario believed the person saying “quit playing, dog” was Lewis, and the rest of the tape was primarily Jackson talking. Jamario continuously denied previously saying that Lewis had been the voice doing the majority of the talking.
 
 [4]
 
 When asked about the individual lines of the statement, Jamario testified that it was all Jackson, and the only statement made by Lewis was him saying “quit playing, dog.” When the recording was played for a third time, Jamario added that it sounded like the defendant saying “real n* * ⅜ ⅞ * sh* * ” in addition to “quit playing, dog” line. Jamario admitted to talking to assistant district attorney Shawn Alford previously and identifying Lewis as the primary speaker, but he claimed that the prosecutor was intentionally attempting to confuse him with the questioning | ^because he did not understand what she was asking. When asked what he was confused about, Jamario stated “[ajlmost everything you saying.” Jamario also testified that he was forced to give statements against his will because the police continued to harass him and he did not have any involvement in the situation.
 

 Shawn Alford
 

 Shawn Alford testified that she was a former assistant district attorney for the Third Judicial District and was the original ADA assigned to the prosecution of Lewis and Jackson, whose trial was set first. In preparation, Alford interviewed Jamario regarding the voicemail recording. Alford stated that she did not originally understand the voicemail recording and forwarded it to Louisiana Tech University where a linguist attempted to decipher the message. While that was somewhat successful, Alford still needed assistance from Jamario.
 

 Alford stated that Jamario was very cooperative with her at that time. She believed the recording was accidental and it appeared that the two individuals were having a conversation and were unaware that it was being recorded. At that point in the investigation, Jamario told Alford that the most talking on the tape came from Lewis. Alford identified State Exhibits 75 and 76 as her handwritten and typed notes made while listening to the recording. Her notes showed she interpreted the statement to be:
 

 Damn, dog. I been on this bar, dog. Know what I’m saying: I been on that sh* *. You heard me? I’m a merk-ass [african-american], dog. Quit playing dog. You know what I’m sayng? Straight mother-fing gangster, dog. Know what I’m talking about? This is real “N” sh* *. I told you I had to have it.
 

 | ^Jamario told Alford that Lewis had made these statements. The statements Jamario attributed to Jackson at that time were, “[q]uit playing dog. I got that rifle back there.” The defendant replied it was a throwaway to which Jamie interjected “[y]ou fing bullshit, got to get a dub off this one.”
 

 Several weeks after Jackson died, Jam-ario changed his interpretation of which brother was responsible for the statements. Alford testified that she believed Jamario realized it would be much easier to say Jackson, who had subsequently died, was responsible for killing Petey. Alford reminded him that he had previously given a different interpretation.
 

 
 *267
 

 Weighing the Evidence
 

 Considering the evidence presented during the trial, both direct and circumstantial, in the light most favorable to the state, it was clearly sufficient to convict Lewis of the charged offense. Through the testimony of its witnesses, the state was able to establish that Lewis and Petey were acquainted, and Lewis was one of the last people known to be with Petey after she left work on August 30. Petey informed her sister that she would be staying the night with Lewis. Petey did not return home the next morning, and she uncharacteristically had not called in or reported for work as scheduled. Lewis was found in possession of the license plate from Petey’s vehicle. Evidence showed he had traded Petey’s Grand Am for Norman’s Delta 88 several hours before he was arrested. Furthermore, when Lewis was stopped on August 31, in addition to the license plate, Lewis was also in possession of Petey’s pit bull puppy. Phillips, Lewis’s passenger at the time he was stopped, testified that Lewis had told him to 127get rid of the puppy after finding out that he was wanted in connection with Petey’s disappearance. Search warrants obtained for the Delta 88 produced a bill of sale and other documents connecting Lewis to Petey’s vehicle as a result of the trade/sale with Norman.
 

 Petey’s body was later found with four gunshot wounds to her head and neck area. Although a murder weapon was never located, Sean Ramsey testified that a .22 rifle had been stolen from his house along with other items, which he later found at Lewis’s abode.
 

 While blood was found in Lewis’s home and on Petey’s car, there was no direct connection of Lewis to the crime with the scientific evidence. Despite the fact that most of the DNA evidence did not provide a direct link to Lewis’s involvement in the murder, there was sufficient other evidence that proved the essential elements of second degree murder and his participation in the crime. Even if the state was not able to establish that Lewis was responsible for firing the fatal shots into Petey’s body, there was sufficient evidence presented by the state from which the trier of fact could have determined that Lewis was actively involved in the crime.
 

 Additionally, the evidence showed that following Petey’s disappearance, Lewis took steps to dispose of her property that was in his possession. Contrary to Lewis’s assertions that Jackson was solely responsible for the victim’s death, the state presented evidence to establish that Lewis was actively involved in disposing of Pe-tey’s property after her death, although Lewis claimed to police that his brother coerced him, through perceived threats of violence, to participate in the actions. | ^However, the evidence showed that Lewis appeared to be in control of all transactions while Jackson merely waited on the sidelines. In fact, it was Lewis who held himself out to others to be the owner of Petey’s property. The defendant’s actions showed that he appeared to be intricately involved in the crime, and his intent or state of mind could be inferred from his actions.
 

 Lewis’s participation in Petey’s murder was also proven by the statements he made following her disappearance, but pri- or to her body being found, on his brother’s voicemail. While Jamario testified that the defendant had not made the statements, but that Jackson was responsible, the state presented the testimony of the former assistant district attorney who had previously interviewed Jamario when he identified the voice on the message as being Lewis’s. The jury, presented with the conflicting evidence, could have reasonably concluded that Lewis made the state
 
 *268
 
 ments and was bragging about his murderous actions. Additionally, even if Jamario was believed, the secondary voice (i.e., Lewis) displayed an awareness of the statements regarding the murder.
 

 Faced with the facts and circumstances in evidence from which to draw an inference according to reason and common experience, the jury concluded that the recited facts and circumstances did not offer a reasonable hypothesis of innocence of the defendant. After reviewing the evidence presented at trial, in the light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded.
 
 Jackson v. Virginia, supra; State v. Edwards,
 
 400 So.2d 1370 (La.1981). So considering, the defendant’s arguments are without merit, and the conviction and sentence by the trial court were not in error.
 

 Conclusion
 

 For the foregoing reasons, the conviction and sentence of James C. Lewis are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . The victim was related to Sondra by blood and marriage, and when the victim’s biological parents were unable to care for her, Sondra and her husband took the victim in and raised her as their own.
 

 [2]
 

 . Gilbert’s testimony was taken in two parts as he was initially called to identify evidence he collected from Lewis’s home.
 

 [3]
 

 . Officer Gilbert also testified that Jamie Jackson was at the house when the initial search warrant was served, but was not arrested at that time. He was later arrested and charged with the victim's murder.
 

 [4]
 

 . The state received permission from the court to treat Jamario as a hostile witness and ask leading questions.